## In re MATURA.

United States District Court
S. D. New York.

Dec. 1, 1949.

Sale & Sale, New York City, attorneys for petitioner.

Oswald I. Kramer, Naturalization Examiner, New York City, attorney for Immigration and Naturalization Service.

IRVING R. KAUFMAN, District Judge.

Petitioner makes application for the granting of his petition for naturalization. The Immigration and Naturalization Service objects to the granting on the ground that petitioner has failed to establish good moral character during the period required by law. Petitioner has filed his petition under Section 701, as amended by Section 324A, Nationality Act of 1940, 8 U.S.C.A. §§ 1001, 724a.

Petitioner is 38 years old, a married male, a native and citizen of Yugoslavia, and was admitted to the United States for permanent residence on November 26, 1946. His petition for naturalization shows that his wife and child both live in Yugoslavia. The question to be determined is whether he has established that he has been a person of good moral character during the period required by law, that is, since at least December 30, 1946.

A deportation hearing was conducted on August 9, 1939 at Ellis Island at which time petitioner stated that he arrived in the United States on or about April 15, 1937, as a stowaway; that he had been married in Yugoslavia on September 26, 1929, and that his wife and two children born of that marriage were living in Yugoslavia. (One child has since been killed). Under a warrant of deportation issued September 25, 1940, petitioner was ordered deported to Yugoslavia on the ground that at the time he entered the United States he was not in possession of an unexpired immigration visa. Deportation could not be effected, however, because of the war in Europe.

The Central Office of the Naturalization and Immigration Service on August 3, 1945, granted petitioner the privilege of voluntary departure and pre-examination. He thereupon re-entered the United States for permanent residence on November 26, 1946.

Petitioner appeared before an officer of the Immigration and Naturalization Serv-

ice on June 23, 1945 and testified that he was married in Yugoslavia in 1929; that the marriage had never been terminated; that outside of one brother he had no close relatives in the United States, and no one in the United States was dependent upon him for support.

It appears, however, that the Naturalization and Immigration Service received information which has been placed in the record on this hearing that the petitioner had started to live with a woman named Rose Longo, also known as Rose Long, and so referred to hereafter, as his wife in 1944, and had been living with her continuously since then. Two children have been born to this woman and the petitioner.

Rose Long was examined on April 25, 1947, before an officer of the Naturalization and Immigration Service, and stated that she was married to Manuel Fernandez, also known as Manuel Vega, on June 17, 1933, and separated from her husband more than five years previous to April 25, 1947; that her marriage had never been legally terminated; (Fernandez is now confined to the Matteawan State Hospital for criminally insane); that she had a child named Richard born of the relationship with the petitioner on June 29, 1946. That she started living with the petitioner in 1944, and since then had sexual relations with him regularly until "just before the birth of our baby." She further testified that she had been using the name of Matura since approximately 1945. On May 29, 1947, petitioner again testified before an officer of the Naturalization and Immigration Service and stated that he had two children with his wife in Yugoslavia, one of whom was killed; that, in addition, he had a child, Richard Matura, born June 29, 1946 in the United States, which he failed to mention previously because "I want to get my citizen paper". Petitioner further stated that he was living with Rose Long in the United States, that he had had sexual relations with her and "I want to marry her and live with her until I die"; that he lived with her as man and wife since October 1944; that Rose Long is a married woman not divorced from her husband; that she holds herself out as his wife in the neighborhood. Petitioner admitted that he lied when he testified on June 23, 1945 in a deportation proceeding that he was living by himself, and did so because of fear that he would not be naturalized. He also admitted on September 9, 1947, before an officer of the Naturalization and Immigration Service that he did not testify accurately and had failed to reveal to the American Consul on November 26, 1946, in connection with his application for an Immigration visa and in connection with his alien registration, the fact that he was living with Rose Long, and had a child named Richard, who were both dependent upon him for support. He testified further that Rose Long was the only one he considered his wife and he wanted to straighten out his status because he wanted to become an American citizen. On May 25, 1948, petitioner stated before an officer of the Naturalization and Immigration Service that he loved Rose Long and their child Richard; that he was going to do everything he could for them, and was anxious to adjust his status. He stated further that he intended to get a divorce from his wife in Yugoslavia and legally marry Rose Long in the United States. There are now two children born of the relationship between petitioner and Rose Long.

The petitioner's position may be summarized by stating that he married in Yugoslavia at the age of 16. The petitioner came to this country as a stowaway in 1937. He immediately obtained a position as a longshoreman and became a member of the International Longshoremen's Association. He worked steadily as a longshoreman until his induction in the United States Army, where he served as a private. He states that in 1944, upon his release from the Army, he was advised that his wife and children had been killed by a bomb, although nothing is submitted to corroborate this belief. This was later proven to be false. One child was killed.

The question, therefore, presented to this Court is whether the petitioner living with a woman in the United States as husband and wife, but without establishing the legality of the marriage and as a result of which relationship children are born, should be

admitted to naturalization, when it appears that he abandoned his family in Yugoslavia and failed to disclose, under the circumstances in the instant case, the existence of his wife and child in Yugoslavia; furthermore, whether perjury concerning these facts on deportation proceedings should be sufficient to deprive petitioner of naturalization.

The solution to the question has given this Court considerable concern. Were this Court to be permitted to answer the question presented in the instant case based upon its own concepts of morality, it would be simple to conclude that naturalization should be denied. However, the cases which have come before the higher courts indicate a trend of liberalism in naturalization cases, which appears to nullify any individual feeling which the Court might have upon the subject matter. The most recent pronouncement on the subject was by the United States Court of Appeals for the Second Circuit, on October 24, 1949, in Schmidt v. United States of America, 177 F.2d 450. In that case, the court had before it the question as to whether to grant naturalization to a person who admitted in an affidavit before the Examiner that "now and then I engaged in an act of sexual intercourse with women. These women have been single and unmarried women. As to the frequency of these acts I can only state that they occurred now and then. My last such act took place about half a year ago with an unmarried woman."

The Court of Appeals, though candidly admitting that the law on the subject was not free from doubt, answered in the negative the question of whether an unmarried man must live completely celibate or forfeit his claim to a good moral character.

In United States v. Manfredi, 1948, 168 F.2d 752, the Third Circuit by a divided court of all its six judges, admitted an unmarried man to citizenship, though he admitted that he had occasional meretricious relations with single women for pay, and in United States v. Palombella, 1948 168 F.2d 903, the same circuit by an equally divided court held that an alien who had a wife and children in Italy, from whom he had apparently not been legally separated, and who had had occasional meretricious relations with single women for pay, should likewise be admitted.

In Petitions of Rudder and three others, 2 Cir., 1947, 159 F.2d 695, the question arose as to what the common standards of morality would be on the facts presented. Each of the four aliens had been living with a woman in an adulterous union. Either the alien or the woman had been unable to get a divorce. All were admitted to naturalization because the Court of Appeals in this Circuit believed that the present sentiment of the community did not view as morally reprehensible such faithful and long relationships as were disclosed under the circumstances. See also United States v. Francioso, 2 Cir., 1947, 164 F.2d 163.

Previously in Estrin v. United States, 1935, 80 F.2d 105, the Court of Appeals for the Second Circuit denied naturalization because of a single act of adultery which had been committed by the petitioner.

The distinction between the late cases decided by the Court of Appeals of this Circuit and the earlier ones seems to be that in the earlier cases naturalization was denied because a meretricious relationship existed—the sexual intercourse accepted as proof of lack of good moral character was prompted by lust. In the later cases there appear to be long term faithful relationships between the couples. Judge Swan speaking for the Court in the Rudder case, stated at page 698 of 159 F.2d:

"And the court decisions, following as they should the mores of the time, show an increasingly liberal trend in naturalization cases."

It is to be noted that in the Schmidt case, the relationship was not adulterous and Judge Learned Hand, writing for the Court, stated:

"We have now to say whether it makes a critical difference that the alien's lapses are casual, concupiscent and promiscuous, but not adulterous. We do not believe that discussion will make our conclusion more persuasive; but, so far as we can divine

anything so tenebrous and inpalpable as the common conscience, these added features do not make a critical difference."

The problem, therefore, resolves itself into a determination whether the community would view the case at bar as one presenting morally reprehensible facts. Cf. Repouille v. United States, 2 Cir., 1947, 165 F.2d 152 (naturalization refused where the alien had killed his child who was a hopeless, bedridden idiot because the conduct did not conform to "the generally accepted moral conventions current at the time".) True, no precise methods are available by which to avoid conjecture on this subject. See Schmidt v. United States, supra.

The facts, however, presented in the instant case differ from the later cases where naturalization was granted, in that while it appears here that there has been a continuous long relationship between the petitioner and Rose Long, additional facts present themselves which would tip the scales against the petitioner in weighing the problem as to the judgment of the common conscience.

Here, the petitioner, aside from the relationship with Rose Long, has apparently abandoned his wife and child living in Yugoslavia. While petitioner has been in the financial position to make contributions to these blood relatives, none has been made in years. Actually nothing appears in the record to indicate that the petitioner recognized his obligation to his family since 1941 or that he even made any attempt to contribute to their support. Nor is there anything to indicate that he even so much as attempted to make application to bring his family from Yugoslavia to this country.

It would appear that a further distinction between the instant case and the Rudder and companion cases, is that in those cases attempts had been made to dissolve the previous marriage by legal process and the attempts had proved futile in each case. In the instant case, no such attempt has been made, although it is indicated that it will be made in the future.

Petitioner merely took up living with Rose Long of whom he is enamored and seems to justify this on the basis that he apparently does not love his lawful wife who resides in Yugoslavia; indeed, it is a sad commentary on the petitioner's moral standard, to fail to recognize at the very least an obligation to his issue living in Yugoslavia regardless of his affection for his wife.

Furthermore, the Government contends that aside from the question of morals, petitioner deliberately committed perjury on the two occasions specified in the statement of facts and that as a result of such perjury committed in connection with the petitioner's immigration, a deportation proceeding is now pending. Apparently the petitioner hopes that his naturalization proceeding will be determined favorably to him, thereby causing the deportation proceedings to fall. It seems incongruous to admit an alien to naturalization before it has been determined that he legally entered the country.

In view of the foregoing, this Court holds that the facts in this case are distinguishable from the cases cited in which naturalization was granted despite the adulterous relationship. To hold otherwise, it seems to this Court, would strike at the very bulwark of society, for it is the family which is the very basic unit of society. This Court would have to condone the abandonment of petitioner's family in Yugoslavia before it proceeded to answer the question as to what the morals were concerning petitioner's relationship with Rose Long in this country. It seems to this Court that the obstacle is insurmountable; that the question as to whether a married man who abandons his family to live with another married woman, with whom he subsequently has children, has committed acts which are morally reprehensible, must be answered in the affirmative. In connection with this consideration it is to be noted once again that the relationship with Rose Long commenced and continued without any effort by petitioner to obtain a legal dissolution of the Yugoslavian marriage. In denying this application the Court is also mindful of the perjury committed by the petitioner on the two occasions above set forth.

The petition for naturalization is denied.