**Petition for Naturalization of
YEE WING TOON.
No. 623972.**

United States District Court
S. D. New York.
Feb. 14, 1957.

**658**

Marvin M. Neuman, New York City, for petitioner.

Morris Rifkin, New York City, Naturalization Examiner.

DAWSON, District Judge.

This petition for naturalization has been opposed by the Naturalization Examiner on the ground that petitioner has failed to establish that he is attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States, as required by § 316(a) of the Immigration and Nationality Act, 8 U.S. C.A. § 1427.

The petitioner, who is 43 years of age, was born in China. He was admitted to the United States for permanent residence in 1927. He has worked in laundries and for a number of years operated a laundry of his own.

The objection to naturalization is based upon three grounds:

(1) That for over ten years petitioner had belonged to an organization known as the Chinese Hand Laundry Alliance, which he knew to be pro-Communist in its leanings and favorable to the present government on the mainland of China, which he also knows is pro-Communist.

(2) That for several years petitioner subscribed to the China Daily News, a foreign language newspaper published in New York, which he knew was pro-Communist in its sympathies.

(3) That on several occasions petitioner had transmitted money to a nephew in Hong Kong, in small amounts, with instructions that part of the sums were to be transmitted to his mother on the mainland of China, and that he knew that the transmission of funds for such purposes was contrary to the laws of the United States and the regulations promulgated thereunder.

Petitioner testified before the Court, with apparent sincerity, that he is attached to the principles of the Constitution of the United States. He said that during the war he had been sympathetic to the so-called Peoples Government of China but that after that government gained control of China he did not like it. He testified in the naturalization proceedings that he is not in favor of Communism and that the Communists "as far as doing anything for the people of China was concerned, were even worse than the Chiang Kai-Shek government."

Sympathy for the so-called Red Government of China during the war with Japan certainly cannot be taken as an indication that the petitioner was opposed to the interests of the United States, inasmuch as the Government of the United

States was, during that period, assisting that group in the war and even endeavoring, through the Marshall mission, to have the Red leaders taken into the government of China.

Petitioner states that he changed his opinion as to the Red government of China in 1949; that information he received as to what the Communists have done in China has made him very much opposed to Communism and to the present government on the mainland of China. That petitioner was not more prescient in determining the nature and objectives of the Communists in China prior to 1949 can hardly be deemed a reflection on him, particularly in view of the fact that our own State Department and high government officials—who, one would assume, had more knowledge and intelligence than a Chinese laundryman— were apparently equally ignorant of the nature and objectives of the Red leaders of China and were not only sympathetic to them but actually afforded them military aid and counsel.

Petitioner stated that he joined the Chinese Hand Laundry Alliance for business purposes, since this organization was sponsoring a wet wash laundry for Chinese laundrymen and he was afraid that if he did not join he could not avail himself of the facilities and assistance which he needed in his business. It was admitted by the Naturalization Examiner that the Chinese Hand Laundry Alliance has never been placed on the Attorney General's list of subversive organizations. Petitioner was neither an officer of the Alliance nor active in its affairs. When he sold his laundry he resigned from this organization. He stated that he knew that a small group of people who were in control of the organization were favorable to the so-called Peoples Government of China but that he had joined the organization many years before there was a pro-Communist government in China. The history of recent years has shown many instances in which small groups of Communists have gained positions of leadership in organizations such as labor unions, welfare committees or other organizations. Does this mean that a person who had been a member of such organization and did not immediately resign is to be deemed to have an attachment to Communist principles? I think not.

Nor does the fact that petitioner subscribed for some years to a Chinese newspaper which editorially supported the Communist cause in China show that the petitioner is himself in sympathy with the policies of the paper. He also subscribed to another Chinese language newspaper. He stated that he wished "to read the information coming from all sides." It is indeed a strange conception that subscribing to a newspaper indicates, in and of itself, that the subscriber is a person who adheres to the editorial policies of that newspaper. An intellectual curiosity for knowledge of all sides of a matter can hardly be said to be contrary to the American spirit and tradition.

■ We now come to a more difficult problem. Petitioner sent money to Hong Kong with instructions that some of it be sent to his mother on the mainland of China, knowing that this was contrary to the laws and regulations of the United States. The Court is convinced from his interrogation of petitioner that petitioner did this not to assist the Communist Government of China but out of that filial loyalty to his parent which is one of the fine aspects of the Chinese character and in the belief that without such assistance his mother might starve. In the choice between obeying the laws of this country and assisting his aged mother he chose to help his mother. What he did was not a crime involving moral turpitude, nor was it something motivated by a political philosophy alien to that of the United States. See In re Nosen, D.C.D.Wash.1931, 49 F.2d 817 (failure to support children in Norway inconsistent with good moral character). In the conflict between following the Fifth Commandment[1] (or the Chinese-

1. Exodus, C. 20:12.

counterpart thereof) and the regulations respecting foreign fund controls, he chose to follow the Divine commandment rather than the technical regulations relating to foreign exchange. The Court is not convinced that this is evidence that he is not disposed to the good order and happiness of the United States. Krausse v. United States, 2 Cir., 1952, 194 F.2d 440; United States v. Francioso, 2 Cir., 1947, 164 F.2d 163; Petition of Kohl, 2 Cir., 1945, 146 F.2d 347; In re Bookschnis, D.C.D.Ore.1945, 61 F.Supp. 751.

█ The Court finds that the petitioner is attached to the principles of the Constitution of the United States and is well disposed to the good order and happiness of the United States. The petition for naturalization should be granted and the oath administered to the petitioner. So ordered.