**Petition for NATURALIZATION OF Tyrone Zoltan DENESSY.**
**Petition No. 8577.**

United States District Court
D. Delaware.
Dec. 8, 1961.

Carl W. Mortenson, Wilmington, Del., for petitioner.

Newton T. Jones, Herbert M. Levy, James P. Morgan, Philadelphia, Pa., for Immigration & Naturalization Service.

LAYTON, District Judge.

This is a petition for naturalization under Section 316 of the Immigration and Naturalization Act. 8 U.S.C.A. § 1427. The Examiner has recommended that the petition be denied, and the matter is now before this court for final determination.

The petitioner, Tyrone Zoltan Denessy, was born in 1920, in Dragesti, Transylvania, Roumania, which at that time was a part of Hungary. Petitioner still refers to himself as Hungarian, though legally he is stateless. He is unmarried and has resided continuously in the United States since his lawful admission for permanent residence on November 6, 1951. There is evidence that petitioner has the equivalent of a Ph.D. degree in Theoretical Chemistry, and that he speaks at least four languages. He has held responsible positions with large corporations in this country as a research chemist, where his superiors have held high opinions of his competence, diligence, and veracity. He left behind him in Hungary a number of relatives, including his mother, an aunt, a cousin and a niece. Since his arrival in the United States, petitioner has supported his mother by sending food parcels and money to Hungary.

The first of three grounds on which the Examiner recommends denial of the petition is that petitioner is not "attached to the principles of the Constitution of the United States," and that he is not "well disposed to the good order and happiness of the United States," as required by Section 316(a) (3) of the Immigration and Nationality Act.[1] The Examiner makes this recommendation because petitioner made two visits to the Communist Hungarian Embassy and made phone calls to the Communist Roumanian Embassy during 1952 while living in Washington, D. C. Petitioner's purpose in contacting the Hungarian Embassy was to expedite shipment of good parcels and money to his mother in Hungary, who relies upon petitioner for support. His purpose in contacting the Roumanian Embassy was to recover, for sentimental reasons, a flute belonging to his deceased father in Roumania. His contacts with both Embassies he reported to the F. B.I. and he complied with F.B.I. requests to cultivate contacts with Roumanian officials if possible. It appears that $60 were successfully transmitted to his mother in Hungary as the result of his contacts in 1952 with the Hungarian Embassy, and that petitioner also received stamps for his collection, and various Hungarian sports results. Through the Roumanians, in 1957, petitioner finally received the flute which had belonged to his father. This contact with Roumanian officials petitioner also reported in detail to the F.B.I. These incidents in the Examiner's opinion, cast "great doubt" that petitioner is attached to the principles of the United States. According to the Examiner, the actions of petitioner in contacting the Hungarian and Roumanian Embassies in Washington for the stated purposes was more than mere thoughtlessness. The Examiner states in his brief that these were the actions of an "egoist and opportunist who would use whatever means available to gain his ends." He argues that petitioner was asking "petty favors" of Communist powers who would ask favors in return that "might well" have been against the interests of the United States. Nowhere, however, does the Examiner show that a single favor was ever done by petitioner for the Communists or Communist Embassies. Indeed, there is no showing that any such favor was even requested by the Communists. Nowhere does the Examiner allege that petitioner is a Communist in belief or by political affiliation, or in any other way. On the other hand, petitioner has vehemently affirmed throughout the preliminary examination, and especially in the hearing before the Court, his repudiation of and hatred for

1. 8 U.S.C.A. § 1427(a) (3).

the Communist philosophy. He also has vigorously denied doing any favors for the Communists. Contacts with the Embassies were either to help his mother, to recover the family flute, or to cultivate "contacts" at the request of the F.B.I.

■ This Court thinks petitioner deserves credit, not censure, for resorting to every means at his disposal to support his mother in Hungary. If there are other grounds for censure or suspicion because of petitioner's contacts with Communist Embassies in Washington, then such grounds should be proven as a fact, not suggested or insinuated. Love of one's mother or of family heirlooms cannot be equated with lack of "attachment" for the United States. Nor do visits and phone calls alone, without more, to the Embassies of Communist countries in regard to relatives or heirlooms, cast any doubt on a petitioner's "attachment."

Recent decisions cast considerable doubt whether the Examiner's finding could be sustained even if he had proved petitioner had been an active member in the Communist party. In the recent decision by the Second Circuit in Klig v. United States,[2] Klig had admittedly engaged in Communist Party activities in Canada many years prior to his petition for naturalization. Nevertheless, Klig's application for citizenship was granted. The Court said, "We do not require perfection in our new citizens."[3] In Nowak v. United States,[4] the Supreme Court refused to denaturalize Nowak even though he had been an active functionary and member of the Communist party within five years before his original naturalization petition. In Chaunt v. United States,[5] the Supreme Court refused to revoke the naturalization of a former Communist who had falsely denied having ever been arrest-

ed for distributing hand bills and other activities. He, in fact, had been arrested three times. See also In re the Petition of Yee Wing Toon,[6] in which the petitioner had been sympathetic to the Red Chinese prior to 1949 and had sent money to his mother on the Chinese Mainland via Hong Kong knowing that his actions were in violation of U. S. laws. The petition for naturalization was granted. With respect to Yee Wing Toon's alleged Communist sympathies, the Court said: "An intellectual curiosity for knowledge of all sides of a matter can hardly be said to be contrary to the American spirit and tradition."[7]

In the light of these authorities, this Court rejects the Examiner's assertion that petitioner Denessy, an avowed anti-Communist, lacks "attachment" to the United States solely because of his contacts with Communist Embassies to help his mother and recover the flute. The Examiner's first recommendation lacks support in either the evidence or in law.

■ The Examiner has recommended denial of this petition for naturalization on the second ground that petitioner has not shown unqualified willingness to bear arms on behalf of the United States against his former homeland, Hungary, and therefore that he cannot take the oath required by Section 337 of the Immigration and Nationality Act[8] without a "mental reservation or purpose of evasion."[9] When Denessy was asked whether he would bear arms on behalf of the United States when required by law, he expressed willingness to do so against all countries except Hungary without qualification. Petitioner was then asked specifically whether he would bear arms against Hungary. Careful review of the testimony in the hearing in which this question was first asked suggests that petitioner was troubled

2. 296 F.2d 343 (2d Cir., 1961).

3. 296 F.2d at 346.

4. 356 U.S. 660, 78 S.Ct. 955, 2 L.Ed. 2d 1048 (1958).

5. 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960).

6. 148 F.Supp. 657 (S.D.N.Y.1957).

7. 148 F.Supp. at 659.

8. 8 U.S.C.A. § 1448.

9. See the text of the Oath of Allegiance, 8 CFR § 337.1(a).

by two considerations in giving an answer to the question. First, it was inconceivable to petitioner that the United States should ever fight against Hungary. In the petitioner's view, the United States would fight Hungary only if Hungary becomes allied with Soviet Russia, and that to petitioner is an impossibility. Second, petitioner could not swear that in the event of war with Hungary he would shoot his own mother, who still lives there. The Examiner tried, patiently and at length, to explain the hypothetical nature of the question, and that petitioner was not being asked to kill his mother. However, it is not clear that petitioner understood the question or the Examiner's explanation. At best, it is debatable whether petitioner refused to bear arms against Hungary in this first hearing. The key testimony was as follows:

"Q. * * * The issue is your willingness to take an oath to bear arms against any country whatsoever, including your native country, for the benefit of this country if called upon to do so. A. I think I can say that, but I just can't imagine that Hungary would fight the United States. The last war they fought against Russia, but the moment they faced American soldiers, everyone surrendered.

*   *   *   *   *   *

"Q. Now, I want to know your answer as to whether you feel if you can take this unqualified oath [to fight for the U. S. against Hungary]? A. Yes, because I am very certain it is most hypothetical.

"Q. Then there is some reservation on your part, is there not? A. I cannot shoot my own mother.

"Q. Nobody asked you to shoot your mother. A. That's what you're asking."

The Examiner relies on the case of In re Krause's Petition [10] in which the petitioner refused to bear arms against her native land, not because of religious training and belief, "but on the ground of the strong love she retains for her native country."[11] The petition for naturalization was denied. However, in the case at bar there is nothing in petitioner's testimony to indicate that the reason for his hesitation in swearing to bear arms on behalf of the United States against Hungary is loyalty or love for the government or national sovereignty of Hungary. This Court does not think that Congress intended citizenship to be denied because a petitioner is reluctant to shoot his own mother. If this reluctance were only a pretext, or excuse concealing a division of national allegiance, then, of course, a different ruling would be indicated, in accordance with the Krause case. However, the Court has had an opportunity to form its own favorable opinion as to the credibility of this petitioner. Also, there is the fact that petitioner has been supporting his mother regularly since his arrival in the United States in 1951. The Court is convinced, therefore, that petitioner had no other reason than love for his mother in hesitating to answer the question about fighting Hungary. In the case of Krausse v. United States,[12] (not to be confused with In re Krause's Petition, cited supra) there is language affirming the holding here that reluctance to shoot relatives in one's native land is not a "mental reservation or purpose of evasion" to the oath required by Section 337 of the Immigration and Nationality Act warranting denial of a petition for naturalization.[13]

At no point has petitioner refused outright to bear arms against Hungary. In later hearings, when it was made clear to petitioner that he was not required to swear he would shoot his mother, he readily affirmed his willingness to fight against Hungary on behalf of the United States, if called upon to do so by law. The Court concludes, therefore, that the Examiner's second grounds for recommending denial of the petition must be rejected.

10.  159 F.Supp. 687 (S.D.Ala.1958).

11.  159 F.Supp. at 688.

12.  194 F.2d 440 (2d Cir., 1952).

13.  See 194 F.2d at 442–443.

The third, and final, ground upon which the Examiner recommends denial of the petition is that Denessy is not a person of good moral character, as required in Section 316(a) (3) of the Immigration and Nationality Act[14] and as defined in Section 101(f).[15] It appears that petitioner, who is unmarried, had regular sexual relations with an unmarried German girl of mature age between June 1956 and September 1957 in a relationship that did not break off completely until August 1958. There is evidence that the girl desperately wanted petitioner to marry her, and that he had no intention of doing so. Her efforts to force marriage included publication of an engagement announcement in local papers. She also threatened suicide or scandal unless the marriage were consummated. Petitioner denies ever making a promise to marry the girl, whom he suggests was confused psychologically, but bought her an engagement ring costing $150 when she threatened suicide unless he did. There is conflicting evidence as to whether the girl ever was pregnant (and, if so, by petitioner), and whether an abortion was performed. At any rate, a settlement was made in July, 1958, in which petitioner paid the girl $300 in compensation for her wedding preparations and she signed a paper releasing him from all claims. Shortly thereafter, the day before leaving for California in September of 1958, the girl went to the office of the Immigration and Naturalization Service where she prepared the affidavit relied upon by the Examiner in finding lack of good moral character.

14. 8 U.S.C.A. § 1427(a) (3).

15. 8 U.S.C.A. § 1101(f).

16. Ibid.

17. See Annotation: Naturalization— "Good Moral Character," 22 A.L.R.2d 244, 250 (1952) and cases cited therein.

18. Marcantonio v. United States, 185 F.2d 934, 937 (4th Cir., 1950). Posusta v. United States, 285 F.2d 533, 534–535 (2 Cir., 1961).

■ What is "good moral character"? The question is comparable to asking "what is beauty" or "what is great art." No two people are likely to agree. Most would probably say here that petitioner's relationship with the unmarried girl makes his moral character less than "excellent" or less than "impeccable." However, the Statute requires only that it be "good." The definition in Section 101 (f) explicitly states that habitual drunkards, those who have committed adultery, polygamists, prostitutes, gamblers, narcotics addicts, murderers, and certain others lack good moral character within the meaning of the Act.[16] The Examiner makes no claim that petitioner's relationship with the girl puts him into any of the above categories. However, the definition goes on to say—

"The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character."

The Courts have said good moral character is conduct which measures up as good among the average citizens of the community in which the applicant lives, or that it is conduct which conforms to the "generally accepted moral conventions current at the time."[17] In applying this test, the Judge must not assume that his own (or the Examiner's) standards are those of the community.[18]

■ A number of cases have held that "moral conventions generally accepted at the time" were not offended by certain types of unusual sexual behavior.[19] A

19. Petitions for naturalization were granted in the following cases:
Petition of Kielblock, 163 F.Supp. 687 (D.C.Cal.1958) (Unmarried female petitioner of mature age had regular sexual relations with an unmarried man; Petitioner had good reputation in the community.); Posusta v. United States, 285 F.2d 533 (2d Cir., 1961) (Female petitioner lived in adulterous relationship with husband before his divorce and their marriage in 1954. But adultery was more than five years before petition for

wide discretion is vested in the trial judge in determining whether or not "good moral character" exists.[20]

█ The facts presented in the case at bar are somewhat analogous to those in Schmidt v. United States.[21] Schmidt, a German, was a teacher of French and German in the College of the City of New York and was qualified for citizenship in every way except that "now and then I engaged in an act in sexual intercourse with [unmarried] women."[22] Before reversing the judgment below, and granting the petition, Judge Learned Hand made this eloquent evaluation of the difficulties in assessing "moral conventions generally accepted at the time."

"It must be owned that the law upon the subject is not free from doubt. We do not see how we can get any help from outside. It would not be practicable—even if the parties had asked for it, which they did not—to conduct an inquiry as to what is the common conscience on the point. Even though we could take a poll, it would not be enough merely to count heads, without any appraisal of the voters. A majority of the votes of those in prisons and brothels, for instance, ought scarcely to outweigh the votes of accredited churchgoers. Nor can we see any reason to suppose that the opinion of clergymen would be a more reliable estimate than our own. The situation is one in which to proceed by any available method would not be more likely to satisfy the impalpable standard, deliberately chosen, than we adopted in the foregoing cases: that is, to resort to our own conjecture, fallible as we recognize it to be. It is true that recent investigations have attempted to throw light upon the actual habits of men in the petitioner's position, and they have disclosed—what few people would have doubted in any event—that his practice is far from uncommon * * *."[23]

Further discussion will add nothing—the Court has reviewed all the evidence, and as best it can has tried to imagine how average citizens would react in similar circumstances. It has also reviewed the past cases to see how other Judges have evaluated similar facts. The Court finds that petitioner has good moral character within the meaning of Section 101(f) and as required by Section 316(a) (3). The Examiner's third ground for recommending denial of the petition is rejected.

█ The purpose of the Immigration Statute is to admit as citizens those who will be law-abiding and useful.[24] This Court believes that petitioner has education and character which will be an asset to this country.

It is ordered that the petition for naturalization be granted.

naturalization). In the following cases the petition for naturalization was denied. Johnson v. United States, 186 F. 2d 588, 22 A.L.R.2d 240 (2d Cir., 1951) (Failure to support wife; desertion; relations with another woman); In re Matura, 87 F.Supp. 429 (S.D.N.Y.1949) (Petitioner abandoned wife and child abroad and lived with another man's wife in this country.)

20. Brukiewicz v. Savoretti, 211 F.2d 541, 543 (5th Cir., 1954).

21. 177 F.2d 450 (2d Cir., 1949).

22. Ibid.

23. 177 F.2d at 451–452.

24. Posusta v. United States, 285 F.2d 533, 536 (2d Cir., 1961).