# CHAUNT v. UNITED STATES.

No. 22.   Argued October 17, 1960.—Decided November 14, 1960.

*Joseph Forer* argued the cause for petitioner.   With him on the brief were *David Rein* and *John W. Porter.*

*Maurice A. Roberts* argued the cause for the United States.   On the briefs were *Solicitor General Rankin, Assistant Attorney General Wilkey, Philip R. Monahan, Beatrice Rosenberg* and *Jerome M. Feit.*

Opinion of the Court by MR. JUSTICE DOUGLAS, announced by MR. JUSTICE HARLAN.

Petitioner, a native of Hungary, was admitted to citizenship by a decree of the District Court in 1940. Respondent filed a complaint to revoke and set aside that

order as authorized by § 340 (a) of the Immigration and Nationality Act of 1952, 66 Stat. 260, as amended, 68 Stat. 1232, 8 U. S. C. § 1451 (a), on the ground that it had been procured "by concealment of a material fact or by willful misrepresentation."[1]  The complaint stated that petitioner had falsely denied membership in the Communist Party and that by virtue of that membership he lacked the requisite attachment to the Constitution, etc., and the intent to renounce foreign allegiance.  It also alleged that petitioner had procured his naturalization by concealing and misrepresenting a record of arrests. The District Court cancelled petitioner's naturalization, finding that he had concealed and misrepresented three matters—his arrests, his membership in the Communist Party, and his allegiance.  The Court of Appeals affirmed, reaching only the question of the concealment of the arrests.  270 F. 2d 179.  The case is here on a writ of certiorari.  362 U. S. 901.

One question, on a form petitioner filled out in connection with his petition for naturalization, asked if he had ever been "arrested or charged with violation of any law of the United States or State or any city ordinance or traffic regulation" and if so to give full particulars.  To

---

[1] The section provides in relevant part:

"It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 310 of this title [§ 1421 of 8 U. S. C.] in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were procured by concealment of a material fact or by willful misrepresentation, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively . . . ."

this question petitioner answered "no." There was evidence that when he was questioned under oath by an examiner he gave the same answer. There was also evidence that if his answer had been "yes," the investigative unit of the Immigration Service would check with the authorities at the places where the arrests occurred "to ascertain . . . whether the full facts were stated."

The District Court found that from 10 to 11 years before petitioner was naturalized he had been arrested three times as follows:

(1) On July 30, 1929, he was arrested for distributing handbills in New Haven, Connecticut, in violation of an ordinance. He pleaded not guilty and was discharged.

(2) On December 21, 1929, he was arrested for violating the park regulations in New Haven, Connecticut, by making "an oration, harangue, or other public demonstration in New Haven Green, outside of the churches." Petitioner pleaded not guilty. Disposition of the charge is not clear, the notation on the court record reading "Found J. S." which respondent suggests may mean "Judgment Suspended" after a finding of guilt.

(3) On March 11, 1930, he was again arrested in New Haven and this time charged with "General Breach of the Peace." He was found guilty by the City Court and fined $25. He took an appeal and the records show "nolled April 7, 1930."

Acquisition of American citizenship is a solemn affair. Full and truthful response to all relevant questions required by the naturalization procedure is, of course, to be exacted, and temporizing with the truth must be vigorously discouraged. Failure to give frank, honest, and unequivocal answers to the court when one seeks naturalization is a serious matter. Complete replies are essential so that the qualifications of the applicant or his lack of them may be ascertained. Suppressed or concealed facts, if known, might in and of themselves justify

denial of citizenship. Or disclosure of the true facts might have led to the discovery of other facts which would justify denial of citizenship.

On the other hand, in view of the grave consequences to the citizen, naturalization decrees are not lightly to be set aside—the evidence must indeed be "clear, unequivocal, and convincing" and not leave "the issue . . . in doubt." *Schneiderman* v. *United States,* 320 U. S. 118, 125, 158; *Baumgartner* v. *United States,* 322 U. S. 665, 670. The issue in these cases is so important to the liberty of the citizen that the weight normally given concurrent findings of two lower courts does not preclude reconsideration here, for we deal with "judgments lying close to opinion regarding the whole nature of our Government and the duties and immunities of citizenship." *Baumgartner* v. *United States, supra,* 671. And see *Klapprott* v. *United States,* 335 U. S. 601, 612 and (concurring opinion) 617.

While disclosure of them was properly exacted, the arrests in these cases were not reflections on the character of the man seeking citizenship. The statute in force at the time of his naturalization required that "he has behaved as a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States" during the previous five years.[2] These arrests were made some years prior to the critical five-year period. They did not, moreover, involve moral turpitude within the meaning of the law. Cf. *Jordan* v. *De George,* 341 U. S. 223. No fraudulent conduct was charged. They involved distributing handbills, making a speech, and a breach of the peace. In one instance he was discharged, in one instance the prosecution was "nolled," and

---

[2] Section 4 of the Naturalization Act of June 29, 1906, 34 Stat. 598, as amended, 45 Stat. 1513–1514.

354

in the other (for making a speech in a park in violation of city regulations) he apparently received a suspended sentence. The totality of the circumstances surrounding the offenses charged makes them of extremely slight consequence. Had they involved moral turpitude or acts directed at the Government, had they involved conduct which even peripherally touched types of activity which might disqualify one from citizenship, a different case would be presented. On this record the nature of these arrests, the crimes charged, and the disposition of the cases do not bring them, inherently, even close to the requirement of "clear, unequivocal, and convincing" evidence that naturalization was illegally procured within the meaning of § 340 (a) of the Immigration and Nationality Act.

It is argued, however, that disclosure of the arrests made in New Haven, Connecticut, in the years 1929 and 1930 would have led to a New Haven investigation at which leads to other evidence—more relevant and material than the arrests—might have been obtained. His residence in New Haven was from February 1929 to November 1930. Since that period was more than five years before his petition for naturalization, the name of his employer at that time was not required by the form prepared by the Service. It is now said, however, that if the arrests had been disclosed and investigated, the Service might well have discovered that petitioner in 1929 was "a district organizer" of the Communist Party in Connecticut. One witness in this denaturalization proceeding testified that such was the fact. An arrest, though by no means probative of any guilt or wrongdoing, is sufficiently significant as an episode in a man's life that it may often be material at least to further enquiry. We do not minimize the importance of that disclosure. In this case, however, we are asked to base materiality on

the tenuous line of investigation that might have led from the arrests to the alleged communistic affiliations, when as a matter of fact petitioner in this same application disclosed that he was an employee and member of the International Workers' Order, which is said to be controlled by the Communist Party. In connection with petitioner's denial of such affiliations, respondent argues that since it was testified that the IWO was an organization controlled and dominated by the Communist Party, it is reasonable to infer that petitioner had those affiliations at the time of the application. But by the same token it would seem that a much less tenuous and speculative nexus with the Communist Party, if it be such, was thereby disclosed and was available for further investigation if it had been deemed appropriate at the time. Cf. *United States* v. *Anastasio,* 226 F. 2d 912. It is said that IWO did not become tainted with Communist control until 1941. We read the record differently. If the Government's case is made out, that taint extended back at least as far as 1939. Had that disclosure not been made in the application, failure to report the arrests would have had greater significance. It could then be forcefully argued that failure to disclose the arrests was part and parcel of a project to conceal a Communist Party affiliation. But on this record, the failure to report the three arrests occurring from 10 to 11 years previously is neutral. We do not speculate as to why they were not disclosed. We only conclude that, in the circumstances of this case, the Government has failed to show by "clear, unequivocal, and convincing" evidence either (1) that facts were suppressed which, if known, would have warranted denial of citizenship or (2) that their disclosure might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship.

There are issues in the case which we do not reach and which were not passed upon by the Court of Appeals. Accordingly the judgment will be reversed and the cause remanded to it so that the other questions raised in the appeal may be considered.

*It is so ordered.*

MR. JUSTICE CLARK, with whom MR. JUSTICE WHITTAKER and MR. JUSTICE STEWART join, dissenting.

Petitioner swore in his application for naturalization that he had never been under arrest when in fact he had been arrested in New Haven, Connecticut, on three separate occasions within an eight-month period. The arrests were for distributing handbills in a public street, making "an oration, harangue, or other public demonstration" in a public park and a "general breach of the peace." Both the District Court and the Court of Appeals have found that petitioner's falsification "was an intentional concealment of a material fact and a willful misrepresentation which foreclosed the Immigration and Naturalization Service and the district court from making a further investigation as to whether he had all the qualifications for citizenship . . . ." These findings, as such, are not disputed. It is nowhere suggested, for example, that the petitioner's falsehoods were the result of inadvertence or forgetfulness—that they were anything but deliberate lies. This Court, however, brushes these findings aside on the ground [1] that the arrests "were not reflections on the char-

---

[1] The Court says that "[t]he totality of the circumstances surrounding the offenses charged makes them of extremely slight consequence." However, it overlooks the fact that neither the content of the handbills or of the harangue in the park nor the nature of the conduct leading to the conviction in the city court for a general breach of the peace appears in the record. Time has served petitioner well, for even the disposition of the cases is not too clear. But

acter of the man seeking citizenship." The Swiss philosopher Amiel tells us that "character is an historical fruit and is the result of a man's biography." Petitioner's past, if truthfully told in his application, would have been an odorous one. So bad that he dared not reveal it. For the Court to reward his dishonesty is nothing short of an open invitation to false swearing to all who seek the high privilege of American citizenship.

The Court first says that arrests of this nature, "the crimes charged, and the disposition of the cases do not bring them, inherently, even close to the requirement of 'clear, unequivocal, and convincing' evidence that naturalization was illegally procured." The Court, of course, knows that this is not the applicable test where one has deliberately falsified his papers and thus foreclosed further investigation. This basis for the reversal, therefore, misses the point involved and should have been of no consequence here.

The test is not whether the truthful answer in itself, or the facts discovered through an investigation prompted by that answer, would have justified a denial of citizenship. It is whether the falsification, by misleading the examining officer, forestalled an investigation which *might have resulted* in the defeat of petitioner's application for naturalization. The Courts of Appeals are without disagreement on this point [2] and it is, of course,

to extrapolate the character of petitioner's conduct solely from these meager circumstances smacks of the psychic. Moreover, to say that the offenses "did not . . . involve moral turpitude" is gratuitous. This Court has never so held.

[2] *Corrado* v. *United States*, 227 F. 2d 780 (C. A. 6th Cir.), cert. denied, 351 U. S. 925; *United States* v. *Montalbano*, 236 F. 2d 757 (C. A. 3d Cir.), cert. denied *sub nom. Genovese* v. *United States*, 352 U. S. 952; *United States* v. *Lumantes*, 139 F. Supp. 574 (D. C. N. D. Calif.), aff'd *per curiam*, 232 F. 2d 216 (C. A. 9th Cir.); *Stacher* v. *United States*, 258 F. 2d 112 (C. A. 9th Cir.), cert. denied,

a necessary rule in order to prevent the making of misrepresentations for the very purpose of forestalling inquiry as to eligibility. The question as to arrests is highly pertinent to the issue of satisfactory moral character, the *sine qua non* of good citizenship. Petitioner's false answer to the question shut off that line of inquiry and was a fraud on the Government and the naturalization court. The majority makes much of the fact that the arrests occurred prior to the five-year statutory period of good behavior, but that is of no consequence. Concealment at the very time of naturalization is the issue here and that act of deliberate falsification before an officer of the Government clearly relates to the petitioner's general moral character. Indeed, the Congress has long made it a felony punishable by imprisonment for a maximum of five years. Certainly this does not fall within a class of peccadilloes which may be overlooked as being without "reflections on the character of the man seeking citizenship." In fact it strips an offender of all civil rights and leaves a shattered character that only a presidential pardon can mend.

The Court concludes that the false denial of prior arrests was "neutral" because the petitioner revealed in his preliminary application that he was an employee of the International Workers Order, which the Court adds, "is said to be controlled by the Communist Party." . What the Court fails to point out is that the sole evidence, in this record, as to the International Workers Order was presented in 1955, 15 years after petitioner's deception of the examiner. There is no evidence that the examiner knew anything about that organization other than what

---

358 U. S. 907; *United States* v. *Accardo,* 113 F. Supp. 783 (D. C. D. N. J.), aff'd *per curiam,* 208 F. 2d 632 (C. A. 3d Cir.), cert. denied, 347 U. S. 952. Cf. *United States* v. *Sweet,* 106 F. Supp. 634, 635 (D. C. E. D. Mich.), aff'd *per curiam,* 211 F. 2d 118 (C. A. 6th Cir.), cert. denied, 348 U. S. 817.

petitioner had told him. And there is nothing whatever in the record that would have even indicated that I. W. O. was communistic in 1940. What was there to prompt the examiner to investigate it at that time? The truth of the matter is that in his final naturalization application petitioner said he was employed by the "Fraternal Benefit Society of Internation [sic] Workers Order," a name which would lead one to believe that it was an insurance society. Surely the Court is not charging the examiner and the naturalization court with the dereliction of admitting petitioner to our citizenship knowing that he was connected with a Communist organization. In fact the testimony at the trial indicates that the Communist Party did not take over the leadership of the International Workers Order until 1941,[3] a year after petitioner was naturalized. It is also well to remember that the Attorney General did not list it as subversive until 1947, although lists of subversive organizations had been issued prior to that date.

As I read the record, it clearly supports the findings of the two courts below. Even if petitioner had told the truth, and the conduct causing the arrests was found not to relate to his present fitness for naturalization, it does not follow that citizenship would have been awarded. It might well have been that in checking on the handbills, the harangue in the public park, and the general breach of the peace the investigator would have been led to discover that petitioner was, in 1940, a leader in the Communist Party. I think it more logical than not that the Government would have discovered petitioner's Communist affiliations through such an investigation, and that the deliberate falsification in 1940 forestalled this revelation

[3] The sole witness on this point testified that "in 1941 . . . a number of us from the Communist Party were sent into that organization by the Communist Party into leadership to give more political content and strength and guidance for that organization."

for 15 years. But whether or not that be the case, the Government was entitled to an honest answer from one who sought admission to its citizenship. We should exact the highest standards of probity and fitness from all applicants. American citizenship is a valuable right. It is prized highly by us who have it and it is sought eagerly by millions who do not. It is asking little enough of those who would be vested with its privileges to demand that they tell the truth.

I would affirm.