not wholly comprised by RACE or NATION, suggesting a common culture or common interests or ideals and a sense of kinship ⟨the Mexican *people* —Virginia Prewett⟩ ⟨the British and American *peoples* —Sir Winston Churchill⟩ ⟨we, the *people* of the United States —*U. S. Constitution*⟩ ⟨we, the *peoples* of the United Nations —*U. N. Charter*⟩ ⟨a new government, which, for certain purposes, would make the people of the several states one *people* —R.B.Taney⟩ syn see in addition VARIETY

**UNITED STATES of America, Plaintiff,**

v.

**Conrad Heinrich SCHELLONG,**
**Defendant.**

No. 81 C 1478.

United States District Court,
N. D. Illinois, E. D.

Sept. 9, 1982.

Dan K. Webb, U. S. Atty., Linda Wawzenski, Asst. U. S. Atty., Chicago, Ill., Allan A. Ryan, Jr., Director, Neal M. Sher, Deputy Director, Joseph F. Lynch, Trial Atty., Janet K. Decosta, Trial Atty., Criminal Division, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Charles W. Nixon, Chicago, Ill., for defendant.

MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

Plaintiff, the United States of America, brought this action pursuant to Section 340(a) of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1451(a), to revoke the citizenship of the defendant, Conrad Heinrich Schellong, on the grounds that the defendant procured his citizenship illegally and by concealment or willful misrepresentation of a material fact. The government contends that the defendant, in applying for an immigration visa and later permanent citizenship, willfully concealed or misrepresented his membership in certain Nazi organizations and his involvement with the concentration camps in Nazi Germany during the 1930's. Beginning on May 26, 1982, this court heard six days of testimony concerning the government's claims and Schellong's defenses. This court has reviewed the transcript of that trial and the relevant exhibits, as well as the parties' post-trial memoranda, and hereby enters the following findings of fact and conclusions of law.

I. *Factual Background.*

Defendant Conrad Schellong was born in Dresden, Germany, in 1910. In the Spring of 1932, as Germany's economy was failing and Hitler was coming into power, the defendant became a member of Germany's

*Sturmabteilungen,* a paramilitary unit of the Nazi Party, more commonly known as the Storm Troopers or "brown shirts." The duties of the storm troopers were generally to guard Nazi meeting halls and to disrupt meetings of opposing political parties. Although the storm troopers are now known to have also participated in numerous acts of street violence and pogroms against the Jewish people during the late 1930's, the record in this case indicates that Schellong remained a member of the group only until November, 1932, and that his sole activities with the organization consisted of his participation in two demonstrations or marches in support of the Nazi Party.

In December, 1932, the defendant joined both the German Nazi Party (Nationalsozialistische Deutsche Arbeiter Partie) and the. *Schutzstaffel,* an organization more commonly known as the "Allgemeine SS" or simply "SS." For purposes of this litigation, it need be noted only briefly that the Nazi Party espoused a philosophy of racial purity, racial superiority, and intolerance toward political and philosophical opposition. The principal function of the Allgemeine SS in the early 1930's was to guard Nazi Party speakers and to carry out party intelligence, although the SS gradually assumed the additional responsibility of the administration and guarding of the concentration camps. The SS was, at all relevant times, distinct from the *Wehrmacht,* or German armed forces, which were composed of Germany's army, air force, and navy. According to the evidence, the defendant remained a member of the Allgemeine SS until 1934, and was a member of the Nazi Party until the fall of Hitler's Germany in 1945.

Of particular importance to this litigation are the defendant's activities between 1934 and 1939. In February 1934, the defendant joined the *SS Sonderkommando "Sachsen"* ("SS Special Commando 'Sachsen'"), an organization stationed at the Sachsenburg Concentration Camp in Saxony, Germany.[1] Upon completion of basic training, the men of the SS Special Commando "Sachsen" were assigned to guard the prisoners and prevent escapes from the Sachsenburg Concentration Camp. The SS Special Commando "Sachsen" were considered *wach truppe,* or "watch troops," distinct from the *Abteilung Drei,* or camp commandant's staff, which was responsible for the daily operation of the camp, prisoners' work schedules, and punishment.

The defendant testified that he began his assignment at Sachsenburg in October 1934 as a corporal, and that his responsibilities included the supervision of a platoon of guards and also service as a Security Officer and a Reserve (or "Alert") Officer on a rotating basis with other platoon leaders. During the defendant's rotation as Security Officer, he was in charge of security for the entire camp for twenty-four hour periods. The SS Special Commando "Sachsen" was renamed the *SS Wachverbande "Sachsen"* ("SS Guard Unit") in late 1934, and renamed again as the *SS Totenkopfverbande "Sachsen"* ("SS Death's Head Unit 'Sachsen'") in April 1936. The defendant's duties during that period, however, did not change significantly.

In early 1936, the defendant was assigned for approximately four months to the 11th Company of the SS Guard Unit "Oberayern" at Germany's Dachau Concentration Camp, near Dachau, Germany, where he participated in a platoon leaders training course. Upon his return to Sachsenburg in late April 1936, the defendant was promoted to the rank of Second Lieutenant, and given command over approximately 30 of the 100 to 120 SS men guarding the camp. The guards under Schellong's supervision

---

**1.** According to the testimony, the Sachsenburg Concentration Camp consisted of one large building, which housed both prisoners and guards in separate sections, a guard house, a medical building, work sites, and an assembly area. The camp was surrounded by a river on one side, and steep hills in the rear. During the time that the defendant was stationed at Sachsenburg, the camp held approximately 400–500 prisoners, including political prisoners, Jehovah's Witnesses, Protestant and Catholic clergy, and Jews. It is uncontested that the prisoners at Sachsenburg were not being held for committing any criminal acts, but rather for the perceived threat which they represented to the success of the Nazi Party.

served as camp guards approximately every fourth or fifth day, supervising the prisoners at the work sites and performing other guard duties to prevent escapes. Guards were instructed to keep alert and were told to warn and then shoot to kill any prisoner attempting to escape.

Although it appears that the SS guards were not directly responsible for the punishment of the camp prisoners and their onerous work schedules, the guards were nevertheless aware of the prisoners' cruel treatment. Schellong testified that he witnessed at least two floggings of prisoners while at Sachsenburg, and that he personally took turns checking on prisoners being held in solitary confinement at the camp. Furthermore, the guards were aware of the work detail of hard labor assigned to the prisoners, including shoveling sewage, breaking rocks, and hauling stones.

In late November 1936, Schellong was transferred to the Dachau Concentration Camp, where he was assigned to the 7th Death's Head Company of the Death's Head Unit "Oberbayern."[2] Between December 1936 and December 1939, when Schellong left Dachau, the defendant commanded the Second Platoon of the 7th Death's Head Company, the 11th Death's Head Company, and the 9th Death's Head Company, all of which were rifle companies that performed guard duty at the camp. The defendant's responsibilities at Dachau included training new recruits, preparation of the duty roster of guards, and the supervision of the guards under his command. Similar to the operation at Sachsenburg, Schellong's men performed their guard duties on a rotating basis, manning the watchtower, guarding the gate, and supervising the forced labor detail. The defendant was promoted twice during his term at Dachau, to First Lieutenant in April 1937, and to Captain in August 1939.

Although there was some testimony that SS guards occasionally participated in the punishment of prisoners at Dachau, and also some testimony that the guards in at least one of Schellong's units were reputed to be among the most abusive guards in the camp, no evidence was presented that Schellong personally beat or physically abused any prisoner at Dachau. Schellong admitted, however, that he was aware of the inhuman treatment of the prisoners he guarded—the forced labor, the living conditions, and the punishment. In a volunteered understatement, the defendant testified that he knew that Dachau was not a "nice place to be," and that the punishment of prisoners and their living and work conditions were "not a nice subject."

In late 1939, as the German war effort mounted, the prisoners at the Dachau Concentration Camp were temporarily reassigned to other camps so that Dachau could be used for actual military training of the SS Death's Head Units. At that time, the various Death's Head Units were consolidated into a single military organization and became, in effect, a distinct and separate branch of the German armed forces. The name given to that military organization was *Waffen SS*, which translated literally meant "armed SS." Prior to 1939, no organization by that name existed. At no time was the Waffen SS considered a part of the German Army.

The record shows that the defendant served with the 6th SS Death's Head Regiment of the Waffen SS in Norway until 1941, when he was transferred to the eastern front for the remainder of the war. Schellong in November 1942 was promoted to Major of his unit in the *Waffen SS,* and by the end of the war, held the rank of Lieutenant Colonel.

2. Witnesses testified that the camp at Dachau was much larger than Sachsenburg, accommodating between 4,000 and 14,000 prisoners during the time that Schellong was stationed there. The camp itself contained a protective arrest area, shops, barracks for the local SS administration, SS guard barracks, officers' quarters and an officers' casino. Unlike Sachsenburg, guards and prisoners were not housed in the same building at Dachau. Dachau's prisoners consisted largely of Jehovah's Witnesses, Jews, Protestant and Catholic clergy, and other opponents of the Nazi Party.

II. *The Defendant's Visa and Citizenship Applications.*

On December 3, 1956, the defendant filed an "Application for Immigrant Visa and Alien Registration" (Form FS–256a) with the United States Consular Office in Hamburg, Germany. In response to Question 26 on the application, requesting the applicant to state his places of previous residence, the defendant answered:

"Birth—1911, Dresden, Germany; 1911–1934, Leipzig, Germany; 1934–1939, German Waffen SS; 1939–1945, Waffen SS during the war, . . ."

No mention was made on Schellong's application of his two years of residence at the Sachsenburg Concentration Camp, or of his three years of residence at Dachau.

On January 24, 1957, the defendant was granted a visa to enter the United States. The defendant entered the United States on or about February 23, 1957, and he has resided in this country ever since that time.

On or about January 29, 1962, the defendant filed an "Application to File Petition for Naturalization" (INS Form N–400) to the Immigration and Naturalization Service. The defendant signed the application on April 16, 1962. In response to Question 7 on the application, requesting the applicant to "[l]ist each organization, association, fund, foundation, club or society in the United States or in any other place that you have been a member of at any time, and the dates of membership in each," the defendant answered:

| | |
|---|---|
| Christlicher Verein junger Maenner [Church organization] | 1920–1927 |
| Leipziger Ballspiel club [Soccer club] | 1926–1932 |
| National Sozialistische Arbeiter Partie [Nazi Party] | 1932–1945 |
| Allgemeine SS  [elite corps] | 1932–1934 |
| Waffen SS    [elite corps] | 1934–1945 |
| Member of the Church of St. Luke [No others][3] | 1957–Date |

No mention was made on Schellong's application of his association with the storm troopers in 1932, or with the *SS Sonderkommando "Sachsen," the SS Wachverbande "Sachsen,"* or with the *SS Totenkopfverbande "Sachsen,"* the Death's Head Unit with which he served for over three years. In addition, no mention was made as to the defendant's association with the SS *Totenkopfverbande* "Oberbayern" (SS Death's Head Unit "Oberbayern") while at Dachau.

On or about April 16, 1962, in connection with the processing of the defendant's application to file a petition for naturalization, the naturalization examiner, Frank M. Siracusa, now-Judge of the Cook County Circuit Court, directed the defendant to provide a sworn written statement concerning certain information on his application. Although the request for a statement was not in writing, and Judge Siracusa was unable to recall the precise wording of his question(s) to Schellong, the defendant's response indicates that the question concerned his activities between 1934 and 1939. Schellong wrote:

"In the years 1927–1933: the economy of Germany went more and more down. The most of the people were out of work. There were only 2 partys which could come on the power: the Communist party and the N.S.D.A.P. I decided with millions of others for the N.S.D.A.P. I do not believe in the supreme blood of the German race.

"The Allgemeine SS were a part organization of the N.S.D.A.P. There member had to march and to protect the speaker by the vote campaign. Because I was strong and healthy they asked me to join and I did. I hath no rang [sic: rank].

"The Waffen SS was a part of the German Army. I like to be soldier and I signed in 1934. I became in all the years in peace and wartime Lt. Colonel. I was highest decorated. I fought only in East against Russia. I had never to do any service in an concentration camp and nev-

**3.** The bracketed materials above were written, not typed, on the defendant's application, and it appears that they may have been written on the form by the Immigration Examiner during his interview with the defendant.

er arrest one man in this matter. I was only soldier.

\* \* \* \* \* \*

On July 17, 1962, the District Court for the Northern District of Illinois, acting on this petition, granted the defendant's Petition for Naturalization and issued to him Certificate of Naturalization No. 8465738.

### III. *Discussion.*

■ Section 212(a) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(19) provides that any alien who has procured a visa "by fraud, or by willfully misrepresenting a material fact" shall be ineligible to obtain a visa and shall be excluded from admission to the United States. Correspondingly, Section 340(a) of the Act, 8 U.S.C. § 1451(a), provides that a certificate of naturalization will be revoked and set aside where it is later found to have been "illegally procured" or "procured by concealment of a material fact or by willful misrepresentation." *See, e.g., Fedorenko v. United States,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981). In addition, the Act states that persons who have given false testimony for the purpose of obtaining benefits under the Act lack, as a matter of law, the good moral character required for obtaining citizenship. 8 U.S.C. § 1101(f)(6). To sustain its burden of proof, the government must establish the facts justifying revocation by "clear, unequivocal, and convincing evidence." *Fedorenko v. United States,* 449 U.S. at 505, 101 S.Ct. at 747. As the Supreme Court has noted, "[a]ny less exacting standard would be inconsistent with the importance of the right that is at stake in a denaturalization proceeding." *Id.* at 505–506, 101 S.Ct. at 747.

### A. *Concealment or Misrepresentation.*

In this case, the government claims that Schellong's use of the term "Waffen SS" in both his visa application and his application for a naturalization petition covering the period from 1934–1939 was willfully false and that he used that term for the purpose of concealing his involvement with the German concentration camps. Furthermore, the government contends that the defendant's supplemental statements that the Waffen SS was "a part of the German Army," and that he "had never to do any service in any concentration camp," were also false, and were also willfully made for the purpose of concealing his concentration camp activities. Such misstatements, the government argues, were material. According to the government, had either the consular official who processed the defendant's visa application or the immigration examiner who processed the defendant's application for a naturalization petition known of the true extent of the defendant's involvement in the SS Death's Head Unit, including his involvement with the concentration camps, his visa and citizenship applications would never have been approved.[4]

It is the defendant's position that he did not conceal or misrepresent his activities in the Sachsenburg or Dachau concentration camps, or his membership in the SS Death's Head organization. The defendant maintains that he never really served in a concentration camp, but was only a trainer of guard troops at the camps. The defendant denies that he ever actually served as a camp guard, and adamantly states that he never struck or otherwise injured a prisoner. Concerning his use of the term "Waffen SS" instead of Death's Head Unit as his organizational affiliation from 1934–1939, and his use of "Waffen SS" as his residence during that period instead of the Sachsenburg and Dachau concentration camps where he was actually residing, the defendant testified that although the military organization known as the Waffen SS did not actually come into existence until 1939, long before that time the term was used as an informal designation for all "armed" SS personnel. Therefore, he claims that his designation of the Waffen SS for both his

---

**4.** The government has also raised several alternative grounds for revocation based on the defendant's participation in acts of prosecution and immorality. The court need not address those arguments, however, if it finds that the defendant willfully concealed or misrepresented material facts on either his visa or citizenship application.

residence and also as his only organizational affiliation (outside of the Nazi Party), reflected a use of common parlance for the time, and not an intentional misrepresentation or concealment of his Death's Head activities in the camps.

The court, having heard all of the evidence presented and after having had the opportunity to review and assess the credibility of the various witnesses, particularly the testimony of the defendant, the immigration examiner Siracusa, and the government's expert witness Dr. Charles Sydnor, finds by clear, convincing and unequivocal evidence that the defendant willfully concealed and misrepresented material facts in his visa and citizenship applications which require that his naturalization certificate be revoked.

The evidence presented by the government conclusively established that during the period from approximately 1934–1936, defendant Schellong resided at the Sachsenburg Concentration Camp in Saxony, Germany, and that while he was there, he was a member of the SS Death's Head Unit "Sachsen." The evidence further established that while he was at Sachsenburg, the defendant's activities included the training of concentration camp guards, and service as the camp Security Officer and as a Reserve Officer on a rotating basis. The record also shows that incident to the defendant's duties as a Death's Head officer at Sachsenburg, the defendant instructed the guards under his supervision to prevent escapes from the camp, and told the guards that if a prisoner were seen escaping, the guard was to warn the prisoner and then shoot to kill him. Furthermore, the court finds that incident to the defendant's duties at Sachsenburg, the defendant was responsible for checking on a prisoner, Erich Jacoby, who was being held in solitary confinement, and that the defendant personally witnessed two floggings while he was at the camp. Finally, the court finds that the defendant was aware of the regime of hard labor and punishment imposed upon the prisoners at Sachsenburg.

The court also finds, based upon all of the evidence presented at trial, that the defendant was stationed at the Dachau Concentration Camp from approximately November 1936–1939, during which time he served as a member of the SS Death's Head Unit at the camp, commanding the Second Platoon of the 7th Death's Head Company, the 11th Death's Head Company, and the 9th Death's Head Company. With respect to the defendant's service at Dachau, the court finds that although the defendant was not housed in the same building that housed the prisoners as he had been at Sachsenburg, the defendant's activities with respect to the concentration camp were significant. The evidence convincingly established that at Dachau, the defendant supervised guard troops who watched the prisoners on work detail, manned the watchtowers to prevent escapes, and engaged in other guard-type activities. The evidence also established that the defendant was aware of the forced labor assignments at the camp, ranging from breaking rocks to hauling raw sewage, and that the defendant was also aware of the punishment inflicted upon the prisoners by the members of the commandant's staff and also by some guards.

In sum, the court finds that the defendant misrepresented his residence on his visa application by deleting any mention of his residence at Sachsenburg and Dachau. Furthermore, the court finds that the defendant misrepresented his organizational affiliations on his application for a naturalization petition by deleting any mention of his affiliation with the SS Sonderkommando "Sachsen," the SS Wachverbande "Sachsen," or particularly the SS Totenkopfverbande "Sachsen" (or Death's Head"). Defendant also failed to include his affiliation with the SS Totenkopfverbande "Oberbayern" (SS Death's Head Unit "Oberbayern" ) while at Dachau. Finally, the court finds that the defendant misrepresented certain information on his supplemental statement in support of his naturalization petition, by stating that the Waffen SS, a term which he had used, was a branch of the German Army and that he had not served in any concentration camp. All of

the above misrepresentations, the court finds, alternatively represent statements which conceal the fact of the defendant's membership in the SS Death's Head and his service supervising guards in the Sachsenburg and Dachau concentration camps.

### B. *Materiality.*

The Supreme Court has held that for purposes of interpreting the immigration laws, a misrepresentation "must be considered material if disclosure of the true facts would have made the applicant ineligible for a visa." *Fedorenko v. United States,* 449 U.S. at 509, 101 S.Ct. at 749. A second, more liberal test for determining materiality in naturalization applications not relied upon by the Supreme Court in *Fedorenko* was expressed in *Chaunt v. United States,* 364 U.S. 350, 355, 81 S.Ct. 147, 150, 5 L.Ed.2d 120 (1960). There, the Court held that the government must show either:

> "(1) that facts were suppressed which, if known, would have warranted denial of citizenship or (2) that their disclosure might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship."

In this case, the court finds that had Schellong not concealed his correct residences on his visa application in 1956, he would have been considered ineligible to receive an immigration visa by virtue of his service at Sachsenburg and Dachau. Lewis D. Junior, who served in the Consular Office at Hamburg for a three-year period following early 1956, testified that visa applications were routinely denied whenever they disclosed service in a concentration camp and that defendant would have been rejected if his documentation showed that he had been involved in a SS Death's Head division at a concentration camp. As the Court in *Fedorenko, supra,* pointed out, "At the very least, a misrepresentation must be considered material if disclosure of the true facts would have made the applicant ineligible for a visa." 449 U.S. at 509, 101 S.Ct. at 749.

In addition, the court finds that the defendant's misrepresentations on his application for a petition of naturalization were material. There, in response to a question requesting all of his organizational affiliations, the defendant failed to list his membership in the SS Death's Head Unit, an answer which would have prompted further investigation "possibly leading to the discovery of other facts warranting denial of citizenship." *Chaunt, supra.* The materiality of the defendant's concealment on his supplemental statement is also evident. Had the defendant properly stated that the Waffen SS (which he had listed as one of his only organizational affiliations) was never considered a part of the German Army, and that his assignments were at two German concentration camps, the court is convinced that further investigation would have taken place, possibly leading to the discovery of other facts warranting denial of Schellong's citizenship petition. *See Chaunt.* The effect of these misstatements and omissions was highlighted when the following hypothetical question was asked of the defendant's immigration examiner:

> MS. WAWZENSKI: If the misrepresentation had to do with failing to disclose the service at these camps, and that he rose to the level of a captain in those camps, that he supervised guards who dealt with forced labor, ordered those guards to shoot to kill anyone who escaped from the camp. If that was the misrepresentation that had been made, what would be your conclusion?
>
> . . . .
>
> THE WITNESS: My conclusion would be to deny the application.

Although the court is not bound to accept the witness' testimony as conclusive, based upon all of the unrebutted testimony concerning the extent of the defendant's involvement in camp activities, the court concludes that the defendant's misrepresentations and omissions were material and if true and complete answers had been given, defendant would not have received his citizenship.

## C. *Intent.*

The parties have agreed that only willful misrepresentations or willful concealment of material facts is actionable under the immigration laws at issue here. See 8 U.S.C. § 1451(a). In this case, the court finds that the misrepresentations and concealment were willful. It is significant that from the time defendant applied for his visa in 1956 until he filed his supplemental affidavit on July 17, 1962, in support of his petition for naturalization, he carefully avoided any references to his residence and his activities at Sachsenburg and Dachau. His excuse for omitting this damaging information is that he used the term Waffen SS to cover his army service during this period.

■ Although the defendant testified in his own behalf concerning the common use of the term Waffen SS as an umbrella term for all armed SS personnel, he failed to introduce any evidence of consequence supporting such a finding. The only evidence offered by the defendant was an officer's evaluation of Schellong prepared in 1940. In that evaluation, the officer listed Schellong as having been with the Waffen SS since 1934. That limited evidence, however, is not seriously probative of any recognized informal acceptance of the term prior to 1940, particularly in light of Dr. Sydnor's testimony that the term was not used. In addition, the government introduced a curriculum vitae prepared by the defendant himself in 1936, in which he lists his organizational affiliations by individual name, rather than collectively as Waffen SS. In fact, Schellong's curriculum vitae makes no mention of the term Waffen SS. Finally, as evidence of willfulness, the court notes that when the defendant was given an opportunity in 1962 to clarify just what he meant by the term Waffen SS, he erroneously stated that it was a part of the German Army, thus drawing attention away from his connection with the concentration camps. Given the widely recognized consequences to an immigrant who had been linked to the concentration camps, on the basis of the testimony presented, defendant had ample reasons to hide his guard service during this period. The court concludes that the government has proven by clear and convincing evidence that the defendant's misrepresentations were willful.

## IV. *Equitable Defenses.*

The defendant has raised a number of equitable defenses, claiming that the representations which he made on his application, including his admitted affiliation with the Nazi Party, should have been sufficient to alert the government to his SS activities as early as 1956 or 1962, and that the government's failure to act on that information until this late date constitutes laches or estoppel, with the same effect as a statute of limitations.

A similar plea was listened to sympathetically by the district judge involved in the appeal in *Fedorenko v. United States,* 449 U.S. at 516–18, 101 S.Ct. at 752–53. In that case, the district court had ruled that even assuming that petitioner had misrepresented material facts, equitable and mitigating circumstances required that the petitioner be permitted to retain his citizenship. In agreeing with the court of appeals that the trial court possessed no such discretion, Mr. Justice Marshall, writing for the Supreme Court, left no question as to the limited authority of a district judge in denaturalization proceedings:

> "[O]nce a district court determines that the Government has met its burden of proving that a naturalized citizen obtained his citizenship illegally or by willful misrepresentation, it has no discretion to excuse the conduct. Indeed, contrary to the District Court's suggestion, ... this issue had been settled by prior decisions of this Court.[5] In case after case, we have rejected lower court efforts to mod-

---

**5.** For other cases to the same effect as *Fedorenko, see also Costello v. United States,* 365 U.S. 265, at 281, 81 S.Ct. 534, at 542, 5 L.Ed.2d 551 (1961); *Knauer v. United States,* 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500 (1946); and *United States v. Ness,* 245 U.S. 319, 38 S.Ct. 118, 62 L.Ed. 321 (1917).

erate or otherwise avoid the statutory mandate of Congress in denaturalization proceedings.... We repeat here what we said in one of these earlier cases:

'An alien who seeks political rights as a member of this Nation can rightfully obtain them only upon the terms and conditions specified by Congress. Courts are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare. *United States v. Ginsberg,* [243 U.S. 472, at 474–475 [37 S.Ct. 422, at 425, 61 L.Ed. 853] (1917).' "

*Fedorenko, supra,* 449 U.S. at 517–518, 101 S.Ct. at 753 (footnote added).

At the least, Conrad Schellong in applying for his visa and his admission to citizenship was under both a moral and a legal obligation to give truthful and complete answers to the questions posed to him. He failed in this test and thereby obtained a grant of citizenship which would otherwise have been denied him. Having taken this course and having willfully made the material misrepresentations and omissions discussed in this opinion, Schellong himself is responsible for the order which follows:

It is the judgment of this court that this court's order of July 17, 1962, admitting defendant to citizenship, is hereby set aside, and it is further ordered that defendant's Certificate of Naturalization No. 8465738 is hereby cancelled, and that said certificate be surrendered to the United States Attorney for the Northern District of Illinois.