**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Conrad Heinrich SCHELLONG,**
**Defendant-Appellant.**

No. 82–2948.

United States Court of Appeals,
Seventh Circuit.

Argued May 11, 1983.

Decided Aug. 24, 1983.[*]

Opinion Sept. 15, 1983.

Rehearing and Rehearing En Banc
Denied Sept. 22, 1983.

Certiorari Denied Jan. 23, 1984.
See 104 S.Ct. 1002.

---

[*] This appeal was originally decided by unreported order on August 24, 1983. See Circuit Rule

35. The Court has subsequently decided to issue the decision as an opinion.

330

Charles W. Nixon, Chicago, Ill., for defendant-appellant.

Janet K. DeCosta, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, ESCH-BACH, Circuit Judge, and CAMPBELL, Senior District Judge.**

CUMMINGS, Chief Judge.

Defendant Conrad H. Schellong appeals from a district court order setting aside a prior order admitting defendant to citizenship, and cancelling defendant's Certificate of Naturalization. *United States v. Schellong,* 547 F.Supp. 569 (N.D.Ill.1982). Plaintiff, the United States of America, brought this action pursuant to Section 340(a) of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1451(a), to revoke the citizenship of the defendant on the grounds that he procured his citizenship illegally and by concealment or willful misrepresentation of a material fact.

The controversy centers around Schellong's activities between 1932 and 1939 as he described them in 1956 on his visa application, in 1962 on his petition for naturalization, and in a supplemental statement filed in connection with that petition. The evidence in the record shows that in 1932 defendant joined the para-military unit of the Nazi Party, the *Sturmabteilungen,* more commonly known as the storm troopers, "brown shirts" or "SA". He remained a member of the SA for several months. In December of 1932 defendant joined both the Nazi Party and the *Schutzstaffel,* commonly known as the Allgemeine SS, and he remained a member of the Allgemeine SS until 1934. As the district court found, "[t]he principal function of the Allgemeine SS in the early 1930's was to guard Nazi Party speakers and to carry out party intelligence, although the SS gradually assumed the additional responsibility of the administration and guarding of the concentration camps." 547 F.Supp. at 570. In February 1934, defendant joined the *SS Sonderkommando "Sachsen"* (SS Special Commando "Sachsen") which was stationed at the Sachsenburg Concentration Camp in Saxony, Germany. The SS Special Commando "Sachsen" was renamed the *SS Wachverbande "Sachsen"* (SS Guard Unit "Sachsen") in

late 1934, and in April 1936 was again renamed the *SS Totenkopfverbande "Sachsen"* (SS Death's Head Unit "Sachsen").

In early 1936, defendant was assigned for approximately four months to the 11th Company of the SS Guard Unit "Oberbayern" at Dachau Concentration Camp, near Dachau, Germany, where he participated in a platoon leaders training course. He returned to Sachsenburg for several months, and was then transferred to Dachau and assigned to the 7th Company of the Death's Head Unit "Oberbayern". Defendant remained at Dachau until December 1939, commanding the Second Platoon of the 7th Death's Head Company, the 11th Death's Head Company, and the 9th Death's Head Company, all of which were rifle companies. In late 1939 as the German war effort mounted, the SS Death's Head Units were consolidated into a single military organization called the *Waffen SS* ("armed" SS). This organization was never considered a part of the German armed forces, the *Wehrmacht.* During this time, defendant rose from a corporal at Sachsenburg in October 1934 to a Captain at Dachau in August 1939. By the end of the war, he held the rank of Lieutenant Colonel.

While at Sachsenburg, defendant's responsibilities included training and supervising a platoon of guards, and service as a Security Officer and a Reserve Officer on a rotating basis with other platoon leaders. During defendant's rotation as Security Officer, he was in charge of security for the entire camp for twenty-four hour periods. Incident to defendant's duties, he instructed the guards under his supervision to prevent escapes from the camp, to warn escaping prisoners and then shoot to kill. Defendant also had responsibility on at least one occasion for checking on a prisoner, Erich Jacoby, who was being held in solitary confinement.

The district court found that "at Dachau, the defendant supervised guard troops who watched the prisoners on work detail,

** The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation.

manned the watchtowers to prevent escapes, and engaged in other guard-type activities." 547 F.Supp. at 574. Defendant contests this finding, arguing that at Dachau he was in charge of a platoon of military recruits who did not have to do guard duty. There is substantial evidence in the record, however, to support the finding that the recruits were trained for both military and guard duty, and kept on reserve in case they were needed to do guard duty or maintain order in the camp.

The district court's opinion contains a succinct summary of defendant's visa and citizenship applications, 547 F.Supp. at 572–573 (footnote omitted):

On December 3, 1956, the defendant filed an "Application for Immigrant Visa and Alien Registration" (Form FS–256a) with the United States Consular Office in Hamburg, Germany. In response to Question 26 on the application, requesting the applicant to state his places of previous residence, the defendant answered:

"Birth—1911, Dresden, Germany; 1911–1934, Leipzig, Germany; 1934–1939, German Waffen SS; 1939–1945, Waffen SS during the war, . . ."

No mention was made on Schellong's application of his two years of residence at the Sachsenburg Concentration Camp, or of his three years of residence at Dachau.

On January 24, 1957, the defendant was granted a visa to enter the United States. The defendant entered the United States on or about February 23, 1957, and he has resided in this country ever since that time.

On or about January 29, 1962, the defendant filed an "Application to File Petition for Naturalization" (INS Form N–400) to the Immigration and Naturalization Service. The defendant signed the application on April 16, 1962. In response to Question 7 on the application, requesting the applicant to "[l]ist each organization, association, fund, foundation, club or society in the United States or in any other place that you have been a member of at any time, and the dates of membership in each," the defendant answered:

| | |
|---|---|
| Christlicher Verein junger Maenner [Church organization] | 1920-1927 |
| Leipziger Ballspiel club [Soccer club] | 1926-1932 |
| National Sozialistische Arbeiter Partie [Nazi Party] | 1932-1945 |
| Allgemeine SS [                    ] [elite corps] | 1932-1934 |
| Waffen SS [                    ] | 1934-1945 |
| Member of the Church of St. Luke [No others] | 1957-Date |

[The five items in brackets may have been written on the form by the immigration examiner.] No mention was made on Schellong's application of his association with the storm troopers in 1932, or with the SS Sonderkommando "Sachsen," the SS Wachverbande "Sachsen," or with the SS Totenkopfverbande "Sachsen," . . . . In addition, no mention was made as to the defendant's association with the SS Totenkopfverbande "Oberbayern" (SS Death's Head Unit "Oberbayern") while at Dachau.

On or about April 16, 1962, in connection with the processing of the defendant's application to file a petition for naturalization, the naturalization examiner, Frank M. Siracusa, now Judge of the Cook County Circuit Court, directed the defendant to provide a sworn written statement concerning certain information on his application. Although the request for a statement was not in writing, and Judge Siracusa was unable to recall the precise wording of his question(s) to Schellong, the defendant's response indicates that the question concerned his activities between 1934 and 1939. Schellong wrote:

"In the years 1927–1933: the economy of Germany went more and more down. The most of the people were out of work. There were only 2 partys which could come on the power: the Communist party and the N.S.D.A.P. I decided with millions of others for the N.S.D.A.P. I do not believe in the supreme blood of the German race.

"The Allgemeine SS were a part organization of the N.S.D.A.P. There member had to march and to protect the

speaker by the vote campaign. Because I was strong and healthy they asked me to join and I did. I hath no rang [sic: rank].

"The Waffen SS was a part of the German Army. I like to be soldier and I signed in 1934. I became in all the years in peace and wartime Lt. Colonel. I was highest decorated. I fought only in East against Russia. I had never to do any service in an concentration camp and never arrest one man in this matter. I was only soldier.

\*　\*　\*　\*　\*　\*

On July 17, 1962, the District Court for the Northern District of Illinois, acting on this petition, granted the defendant's Petition for Naturalization and issued to him Certificate of Naturalization No. 8465738.

## I. *Insufficiency of the evidence*

■ Defendant argues that the government has failed to show willful misrepresentation or concealment on the visa application, the petition for naturalization, or the supplemental statement by clear, unequivocal and convincing evidence. *Fedorenko v. United States,* 449 U.S. 490, 505, 101 S.Ct. 737, 746–47, 66 L.Ed.2d 686; *Chaunt v. United States,* 364 U.S. 350, 353, 81 S.Ct. 147, 149–50, 5 L.Ed.2d 120. On the visa application, when asked to list residences, defendant listed "German Waffen SS" from 1934–1939, and "Waffen SS" from 1939–1945. Defendant failed to list Sachsenburg or Dachau as residences even though he lived at those locations for a total of five years. The government's expert, Dr. Sydnor, testified that the Waffen SS did not exist before 1939, and that consequently, listing "German Waffen SS" as a residence from 1934–1939 was not only not responsive to the question, but was also an impossibility. Defendant responds by claiming that the use of the term "Waffen SS" to mean "armed" SS was common before 1939, even though the Waffen SS was not formally designated as such until 1939. Defendant supports this theory with testimony from his wife, and by introducing an evaluation of Schellong written in 1940 and referring to defendant as joining the Waffen SS in 1934. The district court gave little weight to this evidence.

If this case centered only around the visa application, we would be reluctant to uphold a finding of willful concealment or misrepresentation. The testimony of government witness L. Donald Junior, a former consular official, indicates that the visa application itself was very limited in space; the applicant's answers would be expanded on the supplemental questionnaire which was also required and in the face-to-face interview. Yet no supplemental questionnaire was introduced into evidence in this case, and this Court can only hypothesize as to whether or not Schellong was asked about his Waffen SS service, as the government claims he must have been, and whether or not he clarified or expanded his answer. For all we know at this point, Schellong might have entered "Waffen SS" as a form of shorthand for his residences, fully intending to clarify the answer if given the opportunity to do so.

The visa application is not, however, the only alleged instance of willful misrepresentation or concealment. Six years later defendant was asked on the naturalization petition to list all the organizations and clubs to which he belonged. He failed to list his SA membership in 1932, claiming a lapse of memory, though he did remember to list his church membership from 1920–1927, and his membership in a soccer club from 1926–1932. He again listed Waffen SS, but this time from 1934–1945 rather than dividing it up as in his visa application, into "German Waffen SS" from 1934–1939, and "Waffen SS" from 1939–1945. Defendant omitted his association with the *SS Sonderkommando "Sachsen,"* the *SS Wachverbande "Sachsen,"* the *SS Totenkopfverbande "Sachsen,"* and the *SS Totenkopfverbande "Oberbayern".* There were apparently no space limitations on the naturalization petition that could justify using "Waffen SS" as a shorthand notation. In addition, even if the term "Waffen SS" were used informally during that period—a find-

ing the district court specifically rejected— the evidence shows that on a 1936 *curriculum vitae* prepared by defendant himself, he listed his organizational affiliations by individual name rather than collectively as Waffen SS. Finally, we know that defendant was given the opportunity to clarify or expand his answer in 1962 because the naturalization examiner asked him to provide a supplemental statement. Rather than clarifying the use of the term "Waffen SS," defendant erroneously stated that it was part of the German Army, "thus drawing attention away from his connection with the concentration camps." 547 F.Supp. at 576.

Defendant's further remark on the supplemental statement—"I had never to do any service in an concentration camp"—is by far the most damning. The evidence showed that he was a trainer and supervisor of concentration camp guards. Defendant argues that he never participated in supervising or punishing the camp prisoners; that he was not part of the camp commandant's staff, which was responsible for the daily routine of the prisoners' lives, but was only part of the external guard; that in fact he never "entered" a concentration camp. The government agrees there is no evidence that defendant himself punished any prisoners, though he did check on a prisoner held in solitary confinement at Sachsenburg at least once. The government also agrees that defendant was not part of the commandant's staff, and that he was responsible for prisoners only in that he was to prevent their escape, both from the camp and from outside work sites to which they were escorted. But defendant is playing a semantics game in arguing that he never served "in" a concentration camp but merely served "at" Sachsenburg and Dachau. Clearly, the district court did not believe that Schellong was capable of making such a fine distinction in 1962. Even if such a distinction were plausible, it would be exceedingly difficult to make in the case of Sachsenburg, which was a fenceless camp,

consisting of one large building housing both prisoners and guards in separate sections. In light of these facts, the district court did not err in finding willful misrepresentation or concealment.

■ Defendant also challenges the sufficiency of the evidence on the issue of materiality by challenging the hypothetical questions asked of the government witnesses. Frank Siracusa, the naturalization examiner who reviewed defendant's petition and presently Judge of the Circuit Court of Cook County, Illinois, was asked whether he would have granted it based on the following facts: defendant failed to mention he had served as a guard at Sachsenburg and Dachau; defendant was assigned regularly on a rotating basis as concentration camp Security Officer; he supervised SS guards, posted guards, checked guard posts, ordered guards to shoot to kill escaping prisoners; and at Sachsenburg he commanded a platoon of guards who performed regular services at the camp, accompanying prisoners to their work sites and overseeing them during their daily routine (Tr. 41–42). Judge Siracusa responded that he would have denied the petition based on those facts (Tr. 43). Anthony Petrone, the supervisory naturalization examiner on Mr. Schellong's petition, was asked a similar question and gave a similar answer (Tr. 63–65). Immigration Judge Petrone was also asked what he would have done if he learned that an applicant had participated in the Nazi program of religious and political persecution during the war, and he responded that he would have continued the case pending further investigation (Tr. 66–67). Finally, Mr. Junior, a vice consul with the State Department in Hamburg, Germany in 1956,[1] was asked a question similar to that asked of Judge Siracusa, but embellished with some additional facts: the applicant voluntarily joined the SS Death's Head division; prisoners were subjected to beatings by SS guards, whippings and solitary confinement; and the applicant had trained volun-

---

1. Defendant filed his visa application in 1956 in Hamburg but before a different consular offi-  cer.

tary recruits in the ideology of the Nazi regime (Tr. 92–93). The witness responded that he would have denied the visa (Tr. 94).

Some aspects of the hypothetical questions were clearly improper. For example, Mr. Junior was asked what he would have done if he had known that the guards under the applicant's supervision beat prisoners, whipped them and put them in solitary confinement. There was no evidence in the record that defendant's guards had control over punishment such as solitary confinement. In addition, a question directed to Judge Siracusa implied that defendant's duties as Security Officer were performed both at Dachau and at Sachsenburg, while the evidence indicates that he served on a rotating basis as camp Security Officer only at Sachsenburg. Nonetheless, the district judge made clear that defense counsel was to call to his attention at the end of the trial the failure of the government to introduce into evidence facts necessary to sustain the hypotheticals (Tr. 94). The district judge himself was well aware of the limitations of the government's evidence, for when the government argued in closing that the defendant "participated" in the Nazi program of persecution, the judge noted that there was no evidence implicating defendant in any specific incident (Tr. 532–533). But there were sufficient facts introduced into evidence to show that if the visa examiner or the naturalization examiners had been aware of defendant's role at Sachsenburg as a trainer and supervisor of guards, and as a rotating Security Officer and Officer on Reserve; and of his role at Dachau as a trainer of troops held on reserve for guard duty; and as a member of the SS Death's Head Units, they would have either denied his visa application and naturalization petition (Tr. 43, 65, 94), *Fedorenko v. United States*, 449 U.S. at 514–516, 101 S.Ct. at 751–52, or continued them pending a more detailed investigation (Tr. 67), "possibly leading to the discovery of other facts warranting denial of citizenship." *Chaunt v. United States*, 364 U.S. 350, 355, 81 S.Ct. 147, 150–51, 5 L.Ed.2d 120; *United States v. Fedorenko*, 597 F.2d 946, 951 (5th Cir.1979), affirmed without affirm-ing or denying this particular aspect of materiality, 449 U.S. at 518 n. 40, 101 S.Ct. at 753 n. 40.

## II. *Discovery*

█ The government took several videotaped depositions in California and Europe. Defendant's counsel did not attend them, and consequently had no opportunity to cross-examine those witnesses whose deposition testimony was introduced at trial. Although the government offered to pay all travel expenses plus a *per diem* for food and lodging, defendant's retained counsel demanded attorney's fees, relying on Local Rule 4 of the Northern District of Illinois, which provides that the court may, in its discretion, condition a discovery order on payment of reasonable attorney's fees. Counsel argued that he was entitled to fees because he had "more pressing obligations" in Chicago, and if he stayed in Chicago instead of attending the depositions he could make $600 during one week (Tr. Nov. 12, 1981 at 16). In addition, counsel claimed his client was indigent despite a $4,000 retainer and a fee agreement for $90 an hour. As pointed out by the government before the district court, defendant's income statement showed interest income without revealing the underlying assets and was thus incomplete. Defendant never requested appointed counsel. In light of these facts, we do not think the district court abused its discretion in denying fees in this case. See also *Cassata v. Federal Savings and Loan Insur. Corp.*, 445 F.2d 122, 126 (7th Cir.1971), interpreting *North Atlantic & Gulf S.S. Co. v. United States*, 209 F.2d 487 (2d Cir.1954), relied on by defendant, as allowing attorney's fees in connection with a deposition to be assessed against the United States based on the fact that the United States agreed to the condition. Despite the fact that defendant chose not to attend the depositions, the district court granted him leave to object during the replay of the videotapes. It should be noted that the district court did not rely on the depositions to any great extent in its fact-finding.

Defendant raises numerous other objections, all of which are meritless. He argues that government witnesses Immigration Judge Petrone and L. Donald Junior were presented as experts but were named only after the close of discovery. The government's only expert, however, was Dr. Sydnor, and defendant fails to mention that none of his interrogatories ever sought the names of the government's trial witnesses. Both Judge Petrone and Mr. Junior were listed on the pretrial order, and defendant did not object to either of them before trial (Tr. 60, 72).

■ Defendant also complains about having insufficient time to depose the government's expert, Dr. Sydnor, and insufficient time and money to translate all the government's documents. Defendant thus moved to extend discovery to the year 1999 A.D. Needless to say, the motion was denied. The government provided translations for most of the documents handed over in discovery and gave defendant ample time to depose its expert. The district court did not abuse its discretion in closing discovery.

III. *Jury trial*

■ Defendant argues that he is entitled to a trial by jury. This Court declined to reconsider that issue in *United States v. Walus,* 616 F.2d 283, 304 n. 53 (7th Cir. 1980), and we decline to do so now. We remain bound by the Supreme Court's holding in *Luria v. United States,* 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101, that there is no right to a jury trial in a denaturalization proceeding.

■ Defendant argues that there are alternative constitutional bases for a jury trial, and that *Luria* only decided the Seventh Amendment issue. He argues that Article III and the Sixth Amendment provide defendant with the basis for a jury trial in a denaturalization proceeding. But a denaturalization suit has never been considered to be a criminal prosecution; *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644, does not mandate a contrary result. In that case, the Court considered a statute which provided for automatic forfeiture of citizenship as a penalty for leaving the United States to avoid the draft. Because the loss of citizenship was intended as a penal sanction, the accused was entitled to a criminal trial with all its incidents including trial by jury. A denaturalization proceeding such as this does not entitle a defendant to all the incidents of a criminal trial. Rather, it is well established that such a proceeding is civil in nature. *Schneiderman v. United States,* 320 U.S. 118, 160, 63 S.Ct. 1333, 1353, 87 L.Ed. 1796; *United States v. Minerich,* 250 F.2d 721, 726 (7th Cir.1957). The fact that loss of citizenship in *Mendoza-Martinez, supra,* was intended as a penal sanction explains why the defendant in that case, a native-born American, was entitled to a jury trial; defendant's equal protection argument, based on the difference in treatment between a native-born American and a naturalized citizen, is therefore without merit. So too is defendant's final argument, that the due process clause requires a jury trial in this case. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18. Though revocation of citizenship is a severe sanction, due process was satisfied by a fair trial before an impartial decision-maker.

The judgment of the district court is affirmed.