UNITED STATES of America, Plaintiff,

v.

**ONE LEAR JET AIRCRAFT, SERIAL NO. 35A–280, REGISTRATION NO. YN–BVO, Defendant.**

No. 81–6031–Civ.

United States District Court, S.D. Florida, S.D.

Sept. 12, 1985.

---

770

Jonathoan Goodman, Asst. U.S. Atty., Miami, Fla., for plaintiff.

Ira Kurzban, Kurzban, Kurzban & Weinger, P.A., Miami, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NESBITT, District Judge.

THIS ACTION was tried before the Court. Upon the testimony and the evidence presented, the Court, pursuant to Rule 52(a), Fed.R.Civ.P., enters the following findings of fact and conclusions of law. In making these findings, the Court has considered letters rogatory, depositions, and documents introduced as well as the testimony at trial, and relies only upon those portions of the evidence that are relevant and material and presented by witnesses competent to testify. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

## FINDINGS OF FACT

This case involves a forfeiture action by the United States against One Lear Jet Aircraft, Serial No. 35A–280, Registration No. YN–BVO (Lear jet). The Claimant, Leybda Corporation (Leybda), has asserted ownership of the aircraft and challenges the validity of this forfeiture action. The Amended Complaint contains five counts. Count II was dismissed by Order of Court prior to the time of trial. During trial, the Government dismissed Count III. The case is now before the Court as to Counts I, IV and V. Count I of the Complaint alleges the 1980 version of 8 U.S.C. § 1324 as a basis for forfeiture. This statute provided in pertinent part as follows:

(a) any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—

(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise;

any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs; provided, however, that for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.

(b)(1) any vessel, vehicle or aircraft which is used in the commission of a violation of subsection (a) shall be subject to seizure and forfeiture, except when—

(A) the owner, master or other person in charge of such vessel, vehicle or aircraft, was not, at the time of the alleged illegal act, a consenting party or privy thereto.

Counts IV and V assert that forfeiture is also appropriate under 22 U.S.C. § 401(a) (1979) which provides as follows:

(a) Whenever an attempt is made to export or ship from or take out of the United States any arms or munitions of war or other articles in violation of law, or whenever it is known or there shall be probable cause to believe that any arms or munitions of war or other articles are intended to be or are being or have been exported or removed from the United States in violation of law, the Secretary of the Treasury, or any person duly authorized for the purpose by the President, may seize and detain such arms or munitions of war or other articles and may seize and detain any vessel, vehicle, or aircraft containing the same or which has been or is being used in exporting or attempting to export such arms or munitions of war or other articles. All arms or munitions of war and other articles, vessels, vehicles, and aircraft seized pursuant to this subsection shall be forfeited.

Specifically, the United States alleges that the crewmembers of the Lear jet, with knowledge by Leybda, made material mis-

representations in their visa applications, thereby entering the United States in violation of 8 U.S.C. § 1324 and subjecting the Lear jet to forfeiture. Furthermore, the Government contends that the Lear jet was exported in violation of the export regulations located at 15 C.F.R. § 385.1 and 15 C.F.R. § 387.4.

The facts, as adduced at trial, indicate that on September 1, 1980, the Lear jet aircraft landed at Miami International Airport. At that time, the pilot, Simeon Delfin Espinosa (Espinosa), and two crewmembers, Jorge Hermengildo Toledo Infante (Toledo) and Luis Leonardo Herrera Altuna (Herrera), each presented Nicaraguan passports issued in their names to the United States Customs Inspectors. Each passport contained non-immigrant B–1 and D–1 visas issued by the United States Embassy in Managua. The visa applications were submitted to United States authorities in Managua, Nicaragua, in April, 1980.

Upon arrival in the United States, all three crewmembers completed INS form I–94. I–94 forms, given to non-immigrant aliens to complete upon arrival in the United States, require that among other things, a non-immigrant alien provide his United States address. In the instant case, each crewmember claimed that he was a citizen of Nicaragua and that he had boarded in Managua, Nicaragua. Furthermore, each listed Cuba as their place of birth and provided their Nicaraguan passport numbers.

On September 2, 1980 the jet was flown to Fort Lauderdale-Hollywood International Airport for repairs. On September 5, 1980, agents of the Federal Bureau of Investigation (FBI) and the Immigration and Naturalization Service (INS) observed Espinosa, Toledo, Herrera and a fourth man, later identified as Oscar Vasquez, preparing the aircraft for departure from Fort Lauderdale airport. The agents interviewed the three crewmembers and briefly spoke to Vasquez. FBI Special Agent Duran testified at trial that Espinosa stated that he arrived in Miami on September 1, 1980 in order to repair the Lear jet and

flew it to Fort Lauderdale on September 2 for the same reason.

During the September 5, 1980 airport interview, Espinosa presented a pilot's license issued to him by the Nicaraguan government. He further stated that the Lear jet was owned by a Panamanian company with which Oscar Vasquez was affiliated. Espinosa denied applying for a visa in Havana to pilot Cubana Airlines charter flights to the United States. Both Toledo and Herrera also denied applying for a visa in Havana in 1979 and 1980 as Cubana Airlines crewmembers. The three crewmembers were arrested and charged with violating United States immigration laws and the Lear jet was seized.

In prior criminal procedures, each of the crewmembers was indicted on various counts of visa fraud in violation of 18 U.S.C. § 1546. Each crewmember ultimately changed his plea and pled guilty to one immigration violation, under 18 U.S.C. § 1546, of knowingly possessing a visa application which contained false representations. A United States Immigration Judge determined that Espinosa, Toledo and Herrera were admitted to the United States by presenting a visa obtained by filing a visa application misrepresenting material facts.

At trial, the Government introduced evidence of false or inconsistent statements made by each of the crewmembers in different visa applications and other government forms in support of its claim for forfeiture under Count I of the amended complaint. The discrepancies existing among the various visa applications are numerous. Several of the discrepancies are the result of misrepresentations made on the visa applications submitted in Managua on April 9, 1980 and resulted in the crewmembers admission to the United States in September of 1980. By way of illustration rather than limitation the Court finds that the following misrepresentations and discrepancies exist as to each of the crewmembers.

*Espinosa.* On June 26, 1979 Espinosa filed a visa application at the United States Interests Section in Havana, Cuba. In this

application Espinosa stated that he was a Cuban citizen employed by Cubana de Aviacion—the Cuban state government airline. In addition, he stated that he had resided in Cuba during the previous 34 years—his entire life. Espinosa, in a visa application submitted in Nicaragua on April 9, 1980, represented that he was a Nicaraguan national. In his visa application filed in Havana in June 1979, however, Espinosa represented himself as a Cuban national. His February 15, 1980 application for a Panamanian pilot's license, however, represents his nationality as Cuban. In his visa application filed in Managua, Espinosa denied ever making a prior visa application. This statement is in direct conflict with the fact that he submitted a visa application to the United States Interests Section in Havana. In his April 1980 visa application filed in Nicaragua, Espinosa represented himself as an employee of the Nicaraguan Department of Transportation. In contrast, his prior visa application represented that he was a crewmember of Cubana Airlines. When submitting the visa application to the United States Embassy in Managua, Espinosa represented that he had lived in Managua during the prior ten years. His visa application filed in Cuba the year before claimed that he had resided in Cuba during the previous 34 years. Furthermore, the visa application that Espinosa filed in Managua expressly asked him to indicate all countries he had lived in for more than six months during the past five years. Espinosa wrote Nicaragua, failing to indicate Cuba. The photograph and signature on each application appear to be of the same person.

*Toledo.* Toledo submitted two visa applications to the United States Interests Section in Havana. In the first application submitted on July 9, 1979, Toledo represented himself as a Cuban national who resided in Havana. In the second application filed on January 15, 1980, Toledo listed himself as a Cuban national residing in Havana. Toledo's April 9 application stated that he was a Nicaraguan national. However, in a visa application filed with the United States Interests Section in Ha-

vana on January 15, 1980, he represented that he was a Cuban national. Furthermore, Toledo's February 15, 1980 application for a Panamanian pilot's license stated that he was a Cuban national. In his visa application filed in Managua, Toledo denied ever making a prior visa application. As demonstrated by the Havana Interests Section visa applications introduced during trial, it is clear that Toledo had made two prior applications. In his April 1980 visa application filed in Managua, Toledo represented himself as an employee of the Nicaraguan Department of Transportation. In his January 1980 visa application filed in Havana, however, Toledo identified himself as a crewmember of Cubana Airlines. In the visa application filed in Managua, Toledo represented that he had resided in Nicaragua during the prior ten years. In contrast, the application he filed a few months earlier in Havana lists a Cuban address as his domicile. The photographs and signatures in the applications appear to be of the same person.

*Herrera.* Herrera also submitted two visa applications to the Interests Section in Havana. In the first, Herrera represented himself to be a Cuban national. In his second application, made on June 22, 1979, Herrera stated that he had lived in Cuba for 32 years—his entire life. This application expressly stated that he had been in the United States in 1978, as a crewmember for Cubana Airlines. Herrera filed a third application at the Interests Section in Havana in July 1979, in which he again indicated he had been in the United States in 1978. Herrera's application submitted to United States authorities in Managua on April 10, 1980, represented that he was a Nicaraguan national. In the earlier applications filed in Havana, Herrera represented himself as a Cuban national. As did the others, Herrera denied making any prior visa applications. In the earlier visa applications made in Cuba, Herrera identified himself as an employee of the official Cuban government airline. In his April 1980 visa application in Managua, he represented himself as an employee of the Nicara-

guan Department of Transportation. In the visa application filed in Nicaragua, he claimed that he had resided in Nicaragua during the previous six years. But in one of several visa applications presented the previous year to the United States Interests Section in Cuba, Herrera represented that he had resided in Cuba during the preceding 32 years. In addition, Herrera denied ever being in the United States in his April 1980 visa application submitted in Managua. The 1979 general declarations fro Cubana Airlines list Herrera as a crewmember. In addition, Herrera expressly stated, in his July 4, 1980 application filed in Cuba, that he had been in the United States. The photographs in the different visa applications appear to be of the same person, but they are prints of the very same photograph. The signatures appear identical.

Based on the above-described discrepancies, the Government asserts that Espinosa, as pilot of the Defendant aircraft on September 1, 1980, knew that he and the two crewmembers were not lawfully entitled to enter or reside within the United States because he knew that the visa applications contained false representations. Espinosa was in charge of the Defendant aircraft on September 1, 1980 and consented to, and was privy to, the immigration violations that he and his two crewmembers committed. In their Letters Rogatory testimony, Espinosa, Toledo and Herrera admit to signing the visa applications submitted to the United States Embassy in Managua, Nicaragua.

## CONCLUSIONS OF LAW

■ Under Counts IV and V of the Complaint, the Government alleges that because Cuba was the ultimate consignee of the Defendant aircraft and because no export license was obtained as required by 15 C.F.R. § 385.1, the aircraft was exported in violation of 15 C.F.R. § 385.1 and 15 C.F.R. § 387.4. Without reaching the question of who was the ultimate consignee of the aircraft, the Court finds that the Government has failed to prove that Leybda Corporation had not obtained an export license for the Lear jet. Not one of the Government's witnesses testified that Leybda had failed to obtain the appropriate export license, nor did the Government introduce any documentary evidence attesting to Leybda's failure to obtain the appropriate licensing. Even the Government, in its Memorandum on Judicial Admissions, agrees that its reliance on Leybda's non-verified third party complaint which has been severed from this action is insufficient to establish the non-existence of an export license.

In support of Counts IV and V, the Government relies on the statement of Robert Duncan [1] that Management Jets International did not obtain an export license. However, even the Government has admitted in its Response to the October 19, 1984 Request for Admissions, that whether or not Management Jets International obtained an export license is entirely separable from the question of whether or not Leybda obtained an export license. Accordingly, the Court finds that the Government has failed to produce sufficient evidence in support of Counts IV and V of the Complaint. Therefore, judgment shall be entered in favor of the Claimant as to Counts IV and V.

■ Count I of the Complaint is brought under the prior 1980 version of 8 U.S.C. § 1324. In order to recover under this statute and be entitled to the forfeiture of the Lear jet, the Government must show probable cause for the institution of the suit. *United States v. One 1971 Chevrolet Corvette Automobile*, 496 F.2d 210, 212 (5th Cir.1974). The Government predicates probable cause in this case upon the material misrepresentations made by Espinosa, Toledo and Herrera in the visa applications submitted to U.S. officials on April 9, 1980 in Managua, Nicaragua. As a result of these misrepresentations, the Government

---

**1.** Robert Duncan is the President of Duncan Aviation, the parent company of Management Jets International. Management Jets is the company which sold the Defendant Lear jet to Leybda Corp.

contends that the crewmembers were not lawfully entitled to enter the United States under 8 U.S.C. § 1182(a)(19) subjecting the Defendant aircraft to forfeiture under 8 U.S.C. § 1324.

Initially, the Court finds that 8 U.S.C. § 1182(a)(19) applies to this case as the crewmembers made material misrepresentations in their visa applications of April 1980. Had the response required in the visa application been accurate, further action may have been taken and further investigation may have been made by U.S. Customs officials. For example, if the crewmembers had correctly listed their prior residence in Cuba in applying for a visa, officials might have considered the applications in a different light and at the very least conducted further inquiry. Even a cursory investigation would have revealed that Espinosa, Toledo and Herrera submitted prior visa applications as crewmembers for Cubana de Aviacion, the official Cuban government airline and that Toledo submitted a visa application in Havana as a Cubana Airlines crewmember as recently as three months before the Managua application. Similarly, officials could have determined that Toledo's visa, which was submitted in Havana, was issued less than two months earlier. Had government officials known that the crewmembers lived in Cuba and had submitted prior visa applications, an investigation into the relationship between the applicants and Cuba may have been commenced. Based on the foregoing, the Court finds that the misrepresentations were material under 8 U.S.C. § 1182(a)(19) and justified a probable cause belief by agents of the United States Government that the Defendant aircraft's entry into the United States on September 1, 1980 violated 8 U.S.C. § 1324(a).

The Court must next determine whether Leybda Corp. has successfully proven an absence of actual knowledge of the material misrepresentations and the violation of 8 U.S.C. § 1324(a). Once the Government demonstrates probable cause, the burden shifts to the Claimant, whose responsibility it is to prove the absence of

actual knowledge. *See United States v. Four Million, Two Hundred Fifty-Five Thousand,* 762 F.2d 895 (11th Cir.1985). It is not the Government's burden to prove that the Claimant had actual knowledge. *Id.* The Court finds that the Claimant has failed to satisfy its burden as to the absence of actual knowledge. The Claimant presented no credible evidence that it was not aware of the crewmembers' unlawful entry into the United States. In fact, evidence was introduced during trial indicating that the Claimant knew about the visa applications submitted by the three crewmembers and was in fact acting in concert with them. The evidence established that Oscar Vasquez acted as Leybda's agent and was involved in all aspects of the purchase and operation of the Defendant Lear jet. Documents introduced during the course of the trial indicated that it was Vasquez who arranged to have the three crewmembers and the jet flown to the United States for repairs. As the Claimant produced no owner director or officer of Leybda, Oscar Vasquez is the only known agent of Leybda. The only evidence from a Leybda official is from Jacinto Obregon Sanchez whose name does not appear on any documents submitted to the Court. Despite Obregon's testimony in the Letters Rogatory received by this Court, the evidence indicates that Oscar Vasquez was the only individual acting on behalf of Leybda during the events which occurred prior to the seizure of the aircraft. The Court finds that the Government raised the presumption of actual knowledge which the Claimant failed to negate. *United States v. One 1975 Ford F-100 Pick-up Truck,* 558 F.2d 755, 756 (5th Cir.1977); *United States v. One 1971 Chevrolet Corvette Automobile,* 496 F.2d at 212.

The Claimant has asserted several defenses which merit only brief discussion. The Claimant asserts that it landed the plane in Fort Lauderdale on September 4, 1980 because of an emergency caused by a faulty fuel computer. In essence, the Claimant asserts that the Lear jet entered the United States under the duress caused

by the faulty fuel computer. In order to establish the defense of duress, Leybda must show that the pilot and crewmembers flew the defendant Lear jet into the United States because

(1) [they were] under an immediate threat of death or serious bodily injury, (2) [they] had a well-grounded fear that the threat would be carried out, and (3) [they] had no reasonable opportunity to escape.

*United States v. Blanco,* 754 F.2d 940 (11th Cir.1985).

■ The facts of the case, as adduced during trial, indicate that the immigration violations occurred during the September 1, 1980 landing of the Lear jet. The facts also showed that the jet arrived in Miami on September 1, as the result of a planned and scheduled flight from Cuba rather than as the result of a sudden emergency. Accordingly, the Court finds that the defense of duress is unavailable to the Claimant.

■ Leybda also asserts that 8 U.S.C. § 1324 is inapplicable to the circumstances surrounding the seizure of the Defendant Lear jet. Research has not revealed nor have the parties brought to the Court's attention, a case involving similar facts brought under 8 U.S.C. § 1324. Although this statute is penal in nature and requires strict construction, *see United States v. Washington,* 471 F.2d 402 (5th Cir.), *cert. denied,* 412 U.S. 930, 93 S.Ct. 2759, 37 L.Ed.2d 158 (1973); *see also Mayo v. United States,* 413 F.Supp. 160 (E.D.Ill.1976) (holding that statutes authorizing forfeiture must be construed with strictness), it is the view of this Court that the words of the statute are clear and unambiguous and therefore shall be given their literal and ordinary meaning, *United States v. Bryant,* 671 F.2d 450 (11th Cir.1982); *Smith v. Pingree,* 651 F.2d 1021 (5th Cir. 1981).

■ The Court finds that this case presents a situation where an aircraft was used to bring into the United States "an alien crewman ... not lawfully entitled to enter or reside within the United States."

8 U.S.C. § 1324. The purpose of the statute is satisfied by the forfeiture of the Defendant Lear jet. Leybda has presented no case law in support of its theory that this statute applies solely to traditional "smuggling" cases. Indeed, the United States Court of Appeals for the Fifth Circuit has rejected this argument in *United States v. Washington,* upon 471 F.2d 402, 404 (5th Cir.), *cert. denied,* 412 U.S. 930, 93 S.Ct. 2759, 37 L.Ed.2d 158 (1973). Accordingly, the Court finds that 8 U.S.C. § 1324 applies to the facts of this case.

■ Finally, the Claimant asserts that because the three crewmembers possessed B–1 and D–1 visas but were admitted to the United States as B–2 immigrants, there was no violation of 8 U.S.C. § 1182(a)(19) and hence no justification for the forfeiture of the Defendant aircraft. The Claimant introduced evidence through an attorney specializing in immigration to support its assertion that a B–2 visa is entirely distinct from a B–1 visa and that a B–1 visa will not gain an immigrant admittance to the United States as a B–2 immigrant. Even assuming "expert testimony" was necessary to aid the court in making a determination as to the custom and practice of Customs officials in admitting or not admitting persons with certain types of visas, the Court finds in view of all the testimony that ordinarily a B–1 visa will not gain an immigrant admittance as a B–2 immigrant. However, the Court has also considered the testimony of the Customs Inspector who admitted the three crewmembers that he relied on the visas presented when admitting Espinosa, Toledo and Herrera and inadvertently admitted them as B–2 instead of B–1 immigrants. Because the Customs Inspector relied on the fraudulent visas presented by the crewmembers, the Court finds that a violation of 8 U.S.C. § 1182(a)(19) occurred subjecting the Defendant aircraft to forfeiture.

Based on the foregoing, the Court finds in favor of the Claimant as to Counts IV and V of the Amended Complaint and in favor of the Plaintiff as to Count I of the Amended Complaint. Accordingly, the De-

fendant Lear Jet Aircraft, Serial No. 35A–280, Registration No. YN–BVO, is hereby forfeited to the United States Government.