UNITED STATES of America, Plaintiff-Appellee,

v.

ONE LEAR JET AIRCRAFT, SERIAL NO. 35A–280, REGISTRATION NO. YN–BVO, Defendant,

Leybda Corp., Claimant-Appellant.

No. 85–5938.

United States Court of Appeals, Eleventh Circuit.

Jan. 23, 1987.

Rehearing and Rehearing En Banc Denied March 2, 1987.

---

Ira J. Kurzban, Kurzban, Kurzban & Weinger, P.A., Miami, Fla., for claimant-appellant.

Leon B. Kellner, U.S. Atty., Jonathan Goodman, David O. Leiwant, Sonia Escobio O'Donnell, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before CLARK, EDMONDSON and KEITH *, Circuit Judges.

* Honorable Damon J. Keith, U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

CLARK, Circuit Judge.

This is a civil forfeiture action brought by the United States against a Lear jet. The government alleged, *inter alia*, that the jet's crew members entered this country illegally, having made material misrepresentations on their visa applications. *See* 8 U.S.C. § 1182(a)(19). These violations would trigger the criminal penalty provisions of 8 U.S.C. § 1324(a) and, in turn, the civil forfeiture provisions of 8 U.S.C. § 1324(b) (West Supp.1986). Leybda Corporation, a Panamanian subsidiary of a Nicaraguan corporation, claims ownership of the jet and challenges the validity of the forfeiture. The district court, 617 F.Supp. 769, upheld the forfeiture. We affirm.

## FACTS

Leybda purchased the jet from a dealer in Lincoln, Nebraska for 3.3 million dollars in February, 1980. According to Leybda, the jet was used as an air taxi, flying government officials from the United States, Nicaragua, Jamaica, and other countries to different parts of North and South America and the Caribbean. The pilot (Espinosa) and the two crew members (Toledo and Herrera) were Cuban nationals who had previously worked for Cubana de Aviacion, the Cuban national airline. Between April and September of 1980, the jet and crew entered the United States eight to twelve times, apparently without incident.

On September 1, 1980, the jet landed at Miami International Airport. The jet had just left Cuba and came to Miami to repair a faulty fuel computer. Espinosa, Toledo and Herrera presented their Nicaraguan passports to United States custom inspectors. They each had facially valid non-immigrant B–2 and D–1 visas issued by the United States Embassy in Managua. The applications for these visas had been submitted, along with supporting Letters of Protocol from the Nicaraguan government, to the United States authorities in Managua in April, 1980.

Upon arrival in Miami, the crew members filled out several United States immigration forms. They each claimed to be Nicaraguan citizens and claimed they boarded the jet in Managua. Each listed Cuba as their place of birth and gave their Nicaraguan passport numbers.

On September 2, the crew flew the jet to Ft. Lauderdale for repairs. They attempted to leave on September 4, but had to turn back because of additional problems with the fuel computer. When the crew returned to the jet on September 5, they were being watched by F.B.I. and I.N.S. agents, who had received information that the jet was being operated by the Cuban government. The crew members were seen talking to Oscar Vasquez, who is listed on corporate documents as Leybda's vice president, although Leybda claims it terminated Vasquez' employment on April 1, 1980.[1] The agents interviewed the four men. Espinosa showed his Nicaraguan pilot's license and told the agents that the jet belonged to a Panamanian company with which Vasquez was affiliated. The crew members denied having applied for visas as employees of Cubana Airlines. The three were arrested and charged with violating United States immigration laws, and the jet was seized.

Each crew member subsequently pled guilty to charges of knowingly possessing a visa application which contained false statements, in violation of 18 U.S.C. § 1546. A United States immigration judge found that Espinosa, Toledo and Herrera were admitted to the United States by presenting a visa obtained by the filing of an application misrepresenting material facts.

The district court found that the crew members made several material misrepresentations in their April, 1980 visa applications. We accept the factual findings of the district court unless they are clearly erroneous. *See United States v. Koziy,*

1. At trial, the government used Vasquez' affiliation with Leybda to show that Leybda was aware of the immigration violations committed by the crew members. The government also attempted to show that Vasquez was connected in some way to the Cuban government.

728 F.2d 1314 (11th Cir.), *cert. denied,* 469 U.S. 835, 105 S.Ct. 130, 83 L.Ed.2d 70 (1984). Espinosa was born in Cuba and lived there for the first thirty-four years of his life. Yet, although he listed Cuba as his place of birth, he told United States authorities in Managua that he was a Nicaraguan national and he failed to include Cuba as one of the countries he had lived in for more than six months during the preceding five years. He also denied submitting any prior applications for a United States visa. Yet he applied for a visa in June, 1979, when he was employed by Cubana Airlines.

Toledo also denied making any prior visa applications. The government showed that Toledo in fact submitted two prior visa applications to the United States Interest Section in Havana, the latest one being submitted in January, 1980. In the Managua visa application, Toledo indicated that he had resided in Nicaragua for the prior ten years. In the January, 1980, application, however, he listed a Cuba address as his domicile.

Herrera submitted three visa applications in Havana prior to submitting his application in Managua. In his Managua application, however, Herrera denied making any prior visa applications. He represented that he had lived in Nicaragua for the previous six years, although in one of his prior visa applications he stated that he had lived in Cuba his entire life.

At trial, the government contended that these misrepresentations were material and that Leybda had knowledge that these misrepresentations were made.[2] The district court found for the government and decreed that the jet was forfeited to the United States government. *United States v. One Lear Jet Aircraft,* 617 F.Supp. 769 (S.D.Fla.1985). Leybda appeals from the district court's decision.

**2.** The government offered unrebutted evidence that Oscar Vasquez acted as Leybda's agent and directed the operations of the jet and crew. In fact, in light of Leybda's reluctance to present testimony from its officers, the district court

## I. JURISDICTION

Before proceeding to the merits, we must confront the government's assertion that this court lacks jurisdiction to entertain this appeal. Final judgment in this case was entered on September 12, 1986. On October 4, 1986, the jet was flown by the government to a private facility in Missouri. Leybda, having already noticed this appeal, noticed an appeal to the Eighth Circuit Court of Appeals. That court dismissed the appeal for lack of jurisdiction. The government asserts that this court lost jurisdiction when the jet, the res in this in rem action, was moved outside the territorial jurisdiction of this court.

The government relies on our decisions in *L.B. Harvey Marine, Inc. v. M/V River Arc,* 712 F.2d 458 (11th Cir.1983) ("The presence of the res within a court's territorial jurisdiction is necessary before a court can proceed to adjudication."), and *Taylor v. Tracor Marine, Inc.,* 683 F.2d 1361 (11th Cir.1982) ("Where the res is no longer before the court, its in rem jurisdiction is destroyed, and any appeal from its decision is rendered moot."), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1252, 75 L.Ed.2d 481 (1983).

*L.B. Harvey* and *Taylor* are distinguishable from the present case. In *L.B. Harvey,* a ship was arrested by the court pursuant to a creditor's claim of a maritime lien. After a post-seizure hearing, the court dissolved the warrant of arrest. The ship had been scheduled to leave port on the day the warrant was dissolved, and the ship did in fact leave the jurisdiction on that day. We noted that "[a]ccidental, fraudulent, or improper removal of the res from the district does not destroy in rem jurisdiction once it existed," but there were no charges of impropriety in that case. 712 F.2d at 459. Although we do not suggest that the government intended to defraud Leybda or this court, it is apparent that there was no proper motive for remov-

found that Vasquez was the *only* individual acting on behalf of Leybda during the events which occurred prior to the seizure of the aircraft. 617 F.Supp. at 775.

ing the aircraft from this jurisdiction, especially since Leybda had already filed a notice of appeal.[3] The government has offered no explanation for its decision to store this jet in Missouri as opposed to Florida, instead relying exclusively on the fact that if Leybda wanted to avoid a loss of jurisdiction it could have moved for a stay of execution pending an appeal or it could have posted a supersedeas bond. Although *L.B. Harvey* and *Taylor* refer to the appellants' failure to utilize such procedures, the government may not raise such an argument without showing some justification for removing the res from the jurisdiction. In reaching this conclusion, we are guided by "[a]n interest in justice rather than an automatistic reliance upon rigid legalism." *Treasure Salvors v. Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330, 334 (5th Cir.1978).

In *Taylor,* crew members sued in rem against a vessel to obtain payment of past wages. The vessel was sold and the proceeds were distributed to priority lienholders. We dismissed the claim as moot since the res was no longer located in the jurisdiction, but noted that "[h]ad this case also involved claims in personam, jurisdiction might still lie." 683 F.2d at 1362 n. 2 (citing *Treasure Salvors, supra,* and *Inland Credit Corp. v. M/T BOW EGRET,* 552 F.2d 1148 (5th Cir.1977)). Jurisdiction in this case is not based solely on the presence of the res in the jurisdiction. The government, by bringing this action, has submitted itself to the personal jurisdiction of this court. *See Adam v. Saenger,* 303 U.S. 59, 67–68, 58 S.Ct. 454, 458, 82 L.Ed. 649 (1938); *cf. Treasure Salvors,* 569 F.2d at 335 (government, by intervening in the action and by stipulating to the court's admiralty jurisdiction, waived the usual requirement that the res be present). Moreover, the district court had personal jurisdiction over Leybda by virtue of Leybda's intervention in this matter. *See Treasure Salvors,* 569 F.2d at 335 & n. 6. Thus, since this court has the power to fashion an effective remedy (i.e., requiring the government to return the aircraft), the appeal is not mooted by the fact that the res is outside the jurisdiction. *Cf. Taylor,* 683 F.2d at 1362 (since proceeds from sale of vessel had already been disbursed, any order which the court might issue would be an "empty gesture").

In sum, we note that the fiction of an inanimate object as a defendant is designed to effectuate the adjudication of disputes. The use of this fiction in an attempt to avoid resolution of disputes is disfavored. *See Treasure Salvors,* 569 F.2d at 334. The government's decision to remove the aircraft from this jurisdiction while Leybda's notice of appeal was pending, and for no objectively justifiable reason, does not deprive this court of jurisdiction to entertain this appeal.

## II. SCOPE OF THE IMMIGRATION FORFEITURE STATUTE

This is an unusual forfeiture case because the underlying offense does not concern alien smuggling or drug trafficking. The district court observed that this was the first reported forfeiture case where the

---

**3.** The government argues that their motive in removing the jet from the jurisdiction was not improper. In support of this proposition, the government has cited *United States v. $79,000 in U.S. Currency,* 801 F.2d 738 (5th Cir.1986). In *$79,000,* the court held that the removal of forfeited currency from the jurisdiction deprived the court of the power to hear the appeal. "The government merely acted in its own favor by quickly initiating action to surrender the monies; its actions do not rise to the level of fraud or impropriety...." *Id.* at 740. The key distinction between *$79,000* and the instant case lies in the nature of the forfeited property.

When the government removes forfeited *currency* from the jurisdiction, the forfeited property confers a benefit upon the government apart from the avoidance of an appeal. The currency becomes mixed in with the rest of the money in the federal coffers. In this case, the removal of the jet confers no benefit on the government unless it suffices to deprive the court of jurisdiction. The jet is merely being warehoused in another jurisdiction. Where the only apparent motive behind removing the res from the jurisdiction is to obtain dismissal of an appeal, this court will retain jurisdiction.

predicate offense was visa fraud.[4] 617 F.Supp. at 776. Leybda argues that this "unprecedented extension" of 8 U.S.C. § 1324 is inconsistent with the general rule that forfeiture statutes be construed narrowly. *See United States v. One 1977 Cadillac,* 644 F.2d 500, 501 (5th Cir. Unit B May 1981). We disagree. Leybda's reading of the statute to preclude reliance on visa fraud as a predicate to forfeiture disregards the clear language of the forfeiture statute.

■ Although alien smuggling was a major target of 8 U.S.C. § 1324, it was not the only target. Section 1324(b) allows for forfeiture when a vehicle is involved in the violation of one of the predicate offenses defined in § 1324(a). Section 1324(a) provides:

(a) **Persons liable**

Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—

(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise;

(2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;

(3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation; or

(4) willfully or knowingly encourages or induces, or attempts to encour-

age or induce, either directly or indirectly, the entry into the United States of—

any alien, including *an alien crewman,* not duly admitted by an immigration officer or *not lawfully entitled to enter or reside within the United States* under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs: *Provided, however,* That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring. (emphasis added)

Although we agree with Leybda that forfeiture statutes should be construed narrowly, there is no room for interpretation in this case. The aircraft was used to bring into the United States "an alien crewman ... not lawfully entitled to *enter* or reside within the U.S." This case fits squarely within the scope of the statutory language.

### III. MATERIALITY OF MISREPRESENTATIONS

Forfeiture under 8 U.S.C. § 1324(b) is predicated on the violation of § 1324(a). Section 1324(a), however, merely provides that aiding the "unlawful" entry of aliens is a felony. To determine whether the entry was "unlawful," § 1324(a) directs us to look to "the terms of this chapter or any other law relating to the immigration or expulsion of aliens." 8 U.S.C. § 1324(a). In this case, the government alleges the aircraft was used in an entry which was unlawful under 8 U.S.C. § 1182(a)(19), which provides that:

(a) Except as otherwise provided in this chapter, the following classes of

---

**4.** Leybda's expert witness, Donald Berman, testified that he had never seen the forfeiture statute used in this manner. "I have seen it used for large scale or even single alien smuggling. But I have never seen it when there was a question of paperwork." Record, Vol. 17 at 12.

aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

. . . .

(19) Any alien who seeks to procure, or has sought to procure, or has procured a visa or other documentation, or seeks to enter the United States, by fraud, or by willfully misrepresenting a material fact;

■ The district court found that Espinosa, Herrera, and Toledo willfully misrepresented facts in their Managua visa applications. These factual findings are not clearly erroneous, and they will be accepted by this court. The court also found that these misrepresentations were material because if the applications had been accurate, "further action may have been taken and further investigation may have been made by U.S. Customs officials." 617 F.Supp. at 775. The officials "might have considered the applications in a different light and at the very least conducted further inquiry." *Id.* Furthermore, "an investigation into the relationship between the appellants and Cuba may have been commenced." *Id.* Materiality is a mixed question of fact and law. To the extent these statements are findings of fact as to the probability of further investigation, they are not clearly erroneous, and are accepted. Leybda contends the district court applied an incorrect legal standard in holding that, because of the probability of further investigation, the misrepresentations were material.

■ Leybda argues that the district court should have required the government to prove that, but for the misrepresentations, the crew members *would* have been ineligible to receive visas. We disagree. Under 8 U.S.C. § 1182(a)(19), the government need not establish such a causal relation between the misrepresentation and the granting of the visa application. *See Duran-Garcia v. Neelly,* 246 F.2d 287 (5th Cir.1957). In *Duran-Garcia,* the misrepresentation involved was somewhat similar to the ones involved in the present case. A Mexican citizen received a "crossing card"

entitling her to shop and visit in the United States. When government authorities subsequently discovered that she was living and working in the United States, they cancelled her crossing card and granted her the privilege of voluntary departure to Mexico in lieu of deportation. Three years later, and under a new name, she again applied for a local crossing card for the stated purpose of shopping and visiting. She again began to live and work in Texas. In a subsequent deportation proceeding, an immigration officer concluded that in her second application she failed to disclose the true purpose of her visit and failed to disclose the fact that she had previously accepted voluntary departure in lieu of deportation. This court held both misrepresentations to be material under 8 U.S.C. § 1182(a)(19). The failure to disclose the prior "quasi deportation proceedings" was material because it would "have suggested further inquiry into appellant's actual motives." Significantly, we held that the government need not show that there existed underlying facts which, if discovered after further inquiry, would have precluded the grant of a visa:

> Though perhaps a complete inquiry would have resulted in a discovery of no other material facts than the previous involuntary departure, it has been held that any concealment of information that tends to frustrate the proper official investigations is grounds for excludability under the statute, particularly if the deception is directed primarily against the United States. Landon v. Clarke, [239 F.2d 631 (1st Cir.1956)]. . . .

*Id.* at 291. Thus, according to *Duran-Garcia,* a misrepresentation may be material because it frustrates the government's ability to assess the visa application in its true light.

In this case, each crew member misrepresented at least three facts: (1) their residency in Cuba during the period immediately prior to filing the visa application; (2) their prior submission of visa applications to the United States Interest Section in Havana; and (3) their prior employment as

pilot and crew members for Cubana Airlines. We have little doubt that these misrepresentations were "material" for purposes of 8 U.S.C. § 1182(a)(19). As in *Duran-Garcia*, disclosure of the applicant's close ties with Cuba would have changed the very nature of their applications. The reluctance of the United States to engage in all forms of trade with Cuba is evident in our export regulations. *See* 15 C.F.R. § 385.1 (noting general policy to deny all applications to trade with countries in group Z, one of which is Cuba). It is also clear that the United States' reluctance to trade with Cuba stems from concerns over national security and foreign policy. *Id.* While these regulations certainly would not preclude the issuance of a visa to former Cuban citizens, they indicate the significance of the misrepresentations in this case. Since the misrepresentations deprived the United States officials in Managua of the opportunity to weigh the true implications of their decision to grant visas to these crew members, these misrepresentations were material for purposes of 8 U.S.C. § 1182(a)(19). *Cf. United States v. Palciauskas*, 734 F.2d 625, 628 (11th Cir.

1984) (failure to disclose former employment as mayor of Nazi controlled town was a material misrepresentation on a citizenship application, even though applicant might have been able to convince authorities that mayorship was a figurehead position).[5]

Leybda places great reliance on its allegation that, in 1984, the three crew members involved in this case were granted visas to enter the United States. The only evidence supporting this allegation comes from the testimony of the crew members themselves through letters rogatory. The government disputes that these visas were granted, noting that because they were previously deported, the crew members could only have been granted visas by special permission of the attorney general. 8 U.S.C. § 1182(a)(17). Leybda has not produced documentary evidence that these visas have in fact been granted.

Assuming arguendo that the crew received visas in 1984, our holding that the 1980 misstatements were material would remain unchanged. The theory underlying *Duran-Neely* and *Palciauskas* is that mis-

---

**5.** We are aware of several decisions discussing materiality in the context of denaturalization proceedings. In *Chaunt v. United States*, 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960), the Supreme Court decided that where the government seeks to revoke an individual's citizenship because of a material misrepresentation on a citizenship application, the government must show either: "(1) that facts were suppressed which, if known, would have warranted denial of citizenship or (2) that their disclosure *might* have been useful in an investigation *possibly* leading to the discovery of other facts warranting the denial of citizenship." *Id.* at 355, 81 S.Ct. at 151 (emphasis added). We do not believe that *Chaunt* applies in the context of a forfeiture predicated upon visa fraud. *Accord Fedorenko v. United States*, 449 U.S. 490, 508, 101 S.Ct. 737, 748, 66 L.Ed.2d 686 (1981) (dicta) (suggesting that distinction between citizenship application and visa application could render *Chaunt* inapplicable to situations involving the latter); *id.*, 101 S.Ct. at 755 (Blackmun, J., concurring) (where government seeks to revoke the precious right of citizenship, it may do so only on "scrupulously clear justification and proof"). Even if *Chaunt* does apply in this context, the government's evidence in this case was sufficient to satisfy the second prong of the *Chaunt* test.

Leybda also contends that *Fedorenko, supra,* requires reversal of the district court's opinion in light of the Supreme Court's statement that "the materiality of a false statement in a visa application must be measured in terms of its effect on the applicant's admissibility into this country." 449 U.S. at 509, 101 S.Ct. at 749. We disagree. While *Fedorenko* involved misrepresentations on a visa application, the government in that case was seeking to revoke Fedorenko's citizenship because of his misstatements. Again, in the denaturalization context the government is held to a very high standard of proof. The Court declined to consider whether the *Chaunt* test applied when the misstatements were made upon the individual's initial entry into the country rather than upon his application for citizenship. The misstatements were material under any standard since Fedorenko's former employment as an armed guard at the Treblenka concentration camp would have, if disclosed, disqualified him from obtaining citizenship as a matter of law. Given the unusual circumstances in *Fedorenko*, the Court's unwillingness to develop a new materiality standard, and the fact that the government was seeking denaturalization as opposed to forfeiture, we find that *Fedorenko* has little bearing on the present case.

representations are material if they could have had a significant impact on the decision making process of the immigration official authorized to grant or deny the visa. Disclosure of the true facts on the visa applications involved in this case almost certainly would have affected the decision made in 1980 with regard to those applications by the United States embassy in Managua.

■ The essential feature of a material misrepresentation is that it misleads the government officials with respect to an area of *potential* significance in the decision to grant or deny the visa. By hiding their past association with Cubana Airlines, their lifetime residence in Cuba, and their prior visa applications as Cuban citizens, the crew members deprived the United States officials in Managua of the chance to assess the international implications raised by their visa applications. Since an applicant's prior association with Cuba is a significant area of inquiry, failure to disclose such a prior association is a material misrepresentation under 8 U.S.C. § 1182(a)(19).

## IV. BURDEN OF PROOF ON THE INNOCENT OWNER DEFENSE

The district court found that Leybda failed to prove an absence of actual knowledge of the violations of 8 U.S.C. § 1324(a). 617 F.Supp. at 775. Leybda contends that, under the version of § 1324(b) applicable at the time of the forfeiture, the burden was on the government to prove Leybda's actual knowledge of the illegality.

In 1980, when this proceeding began, § 1324(b) was silent on the issue of burden of proof. The language with regard to the

"innocent owner" defense was the following:

No conveyance used by any person as common carrier in the transaction of business as a common carrier shall be forfeited under the provisions of this section unless it shall appear that the owner or other person in charge of such conveyance was a consenting party or privy to the illegal act.

8 U.S.C. § 1324(b)(1)(A). A 1981 amendment to the statute makes it clear that once the government establishes probable cause for instituting the forfeiture action, the burden of proof shifts to the claimant. 8 U.S.C. § 1324(b)(5) (West Supp.1986). Leybda points to the amendment and accompanying legislative history [6] in support of its argument that, under the 1980 version of the statute,[7] the government bore the burden of proof.

At trial, Leybda conceded the burden of proof issue on two separate occasions. Just before the government's first witness was called, the government argued that Leybda had the burden of proof on the innocent owner defense. After the court expressed its agreement with the government's position, Leybda's counsel said "I think Mr. Goodman [the U.S. Attorney] is right about that." Record, Vol. 11 at 55. Again, during closing argument, Leybda's counsel stated "it is true that Leybda Corporation must prove that they did not have actual knowledge." Record, Vol. 19 at 31.

■ An appellate court generally will not consider an issue raised for the first time on appeal unless failure to do so would result in a miscarriage of justice. *Sanders v. United States*, 740 F.2d 886, 888 (11th Cir.1984). This is especially true

6. The House Report on the 1981 amendment indicated that the law was being strengthened in order to remove ambiguity regarding the government's responsibilities in forfeiture procedures. The report notes that "the Office of Legal Counsel for the Department of Justice concluded that while existing law can be read to permit seizure prior to any inquiry as to the owners complicity, the government bears the burden of establishing actual knowledge on the part of the owner to affect a forfeiture of the conveyance." 1981 U.S.Code Cong. & Admin. News 2577, 2596–97. The report goes on to note that "this legislation relieves the government of

the burden of proving actual knowledge on the part of owners." *Id.* at 2597. According to Leybda, the foregoing shows that, under pre–1981 law, the government was required to prove actual knowledge.

7. At trial, the government conceded that the 1980 version of the statute applies to this case. We are, of course, not bound by this concession, but given our disposition of this matter we find it unnecessary to pass upon the retroactivity of the 1981 amendments.

where the appellant pursued a contrary position before the district court.[8] *Id.* Failure to decide the burden of proof issue is not a miscarriage of justice in this case because we find, upon examination of the record, that the government offered sufficient evidence of actual knowledge to satisfy the burden of proof, assuming the government bore that burden under the 1980 version of the statute.

## V. OTHER ISSUES

### A. *Use Of Hearsay.*

Leybda complains that much of the evidence relied on by the district court was inadmissible hearsay. The most damaging evidence introduced by the government, i.e. the visa applications and Leybda's corporate records, was admissible under the government and business records exceptions to the hearsay rule. *See* Fed.R.Evid. 803(6) & (8). To the extent hearsay was improperly admitted, we find any error harmless. *See Fishing Fleet Inc. v. Trident Insurance Co.,* 598 F.2d 925 (5th Cir. 1979) (in a bench trial it is presumed that a district judge's findings are based on admissible evidence).[9]

### B. *Assertion Of Privileges By The Government.*

■ During discovery, the government refused to produce certain documents because the documents were said to be protected by various privileges. The government contended that the documents contained sensitive information and submitted the documents to the district court for *in camera* review. The district court upheld the government's claims of privilege and found that the documents were irrelevant to this case. Leybda argues on appeal that the government was improperly permitted to invoke the jurisdiction of the court while hiding behind privileges in an attempt to hinder Leybda's defense. We are persuaded that the district court's finding that the documents were privileged and irrelevant precludes Leybda's argument that the government should have had to "disclose or dismiss."

### C. *Request For A Jury Trial.*

■ The government's complaint in this case was filed on January 19, 1981. Leybda requested a jury trial pursuant to Fed. R.Civ.P. 39(b) on June 25, 1985. Leybda's sole argument in support of its 39(b) motion was that the district court viewed allegedly prejudicial government documents during an *in camera* proceeding to determine whether the documents were privileged. This procedure did not render the district judge incapable of presiding over a fair bench trial. The district court did not abuse its discretion in denying Leybda's jury trial request as untimely. *See Parrott v. Wilson,* 707 F.2d 1262, 1267 (11th Cir.), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983).

### D. *Surprise Evidence.*

■ On the eve of trial, FBI Agent Duran notified the United States Attorney that he had discovered additional notes regarding his investigation. These notes were turned over to Leybda's counsel. Leybda contends that the district court should have granted a continuance or ordered a mistrial since these notes revealed "scores of new eyewitnesses." The district court made every attempt to allow Leybda to conduct additional discovery during trial. Moreover, there is no indication that Leyb-

---

**8.** Leybda points out that it contested the burden of proof issue in the parties' pretrial stipulation. Still, the issue was not squarely before the district court because the pretrial stipulation preceded Leybda's concession of this issue at trial.

**9.** The government argued that otherwise inadmissible hearsay is admissible in a forfeiture proceeding to establish probable cause for instituting the proceeding. *See Bush v. United States,* 389 F.2d 485, 489 (5th Cir.1968). 8 U.S.C. § 1324(b)(5), enacted in 1981, makes clear that the government need only establish probable cause in order to shift the burden of proof over to the claimant. *Bush* makes clear that hearsay would be admissible to satisfy the government's burden under this statute. Again, given our disposition of this issue, we need not decide the extent of the government's burden under the 1980 version of the statute. As a result, we express no opinion as to the applicability of *Bush* where the government's burden is greater than merely the establishment of probable cause.

da was prejudiced by the late disclosure of the notes. The United States Attorney, who had no previous knowledge that the notes existed, made no use of the notes at trial. In addition, the eyewitness most prominently mentioned in the notes, David Block, would not have been a crucial witness. Block's plane landed in Miami just after the Lear Jet landed, and he observed the jet's crew while they were being inspected by custom officials. Under these circumstances, the district court was not required to declare a mistrial, and its efforts to facilitate discovery during trial were a sufficient substitute for a continuance.

## VI. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.